## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                        No. CR 14-2783 JB

THOMAS R. RODELLA and
THOMAS R. RODELLA, JR.,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Motion for Release Pending Appeal, filed February 6, 2015 (Doc. 195)("Motion"). The primary issues are: (i) whether Defendant Thomas R. Rodella has presented a substantial question that, if answered in his favor, would likely result in a new trial; and (ii) whether Rodella has shown exceptional circumstances, which are required for a violent offender to be released pending appeal. The Court will deny the Motion, because Rodella has not presented a substantial question, and, even if he had, any judicial error or prosecutorial misconduct was harmless. Further, because Rodella's strength of appeal, health, offense, former profession, and family situation are not exceptional, the Court will deny the Motion.

## FACTUAL BACKGROUND

Given the jury's verdict, the Court takes the facts from the evidence in a light most favorable to the United States. On March 11, 2014, Michael Tafoya pulled his car out of a driveway and onto the road, while a green jeep was traveling down the same road. Thomas R. Rodella, Jr., who was driving the jeep, began flashing the jeep's headlights and began tailgating Tafoya's car for the next quarter mile. Tafoya slowed down his car and pulled over to the side of

the road to allow the jeep to pass.  Once stopped, Tafoya raised his hands and said: "What the hell?"  The jeep passed Tafoya's car, but then stopped in the middle of the road and backed up, until it parked about twenty-five feet in front of Tafoya's car.  Rodella and Rodella, Jr. got out the jeep and began walking towards Tafoya's car while motioning for Tafoya to get out of his car and saying "come on."  Because Tafoya thought that Rodella and Rodella, Jr. wanted to fight, and because he did not know whom they were, he was afraid.  Wanting to avoid a confrontation, Tafoya drove away, and Rodella and Rodella, Jr. got back into the jeep and began chasing him.

Tafoya sped up, and eventually turned onto a private dirt road to escape from Rodella and Rodella, Jr.  When Tafoya reached the end of the dirt road, he tried to turn his car around while Rodella got out of the jeep with a gun in his hand.  Tafoya backed up his car until it hit a pole that was behind it.  Rodella opened the passenger door of Tafoya's car and jumped in with his gun in his hand.  Rodella attempted to point the gun at Tafoya's face, and Tafoya begged for Rodella not to kill him.  While Tafoya was begging Rodella not to kill him, Rodella twice yelled: "It's too late."  From the driver's side of the car, Rodella, Jr. grabbed Tafoya by his arm and shirt, pulled him out of the car, and threw him to the ground.  Rodella, Jr. held Tafoya on the ground and told Tafoya that Rodella was the sheriff.  Tafoya asked to see Rodella's badge, and Rodella pulled Tafoya's head up by his hair and said: "You want to see my badge mother fucker?  Here's my badge."  Rodella then struck Tafoya in his face with the badge.  Before being hit in the face with the badge, Tafoya did not see Rodella display his badge and did not know that he was the sheriff.  The Rio Arriba County Deputy Sheriffs arrived, and Tafoya was handcuffed and arrested.

## PROCEDURAL BACKGROUND

After a five-day trial, Rodella was convicted of violating Tafoya's constitutional rights by using unreasonable force and for conducting an unlawful arrest.  See Verdict at 1, filed September 26, 2014 (Doc. 127)("Verdict").  Rodella was also convicted of using a firearm during the commission of a crime of violence.  See Verdict at 2.  The Court sentenced Rodella to 121-months imprisonment.  See Memorandum Opinion and Order, filed February 5, 2015 (Doc. 184)("Sentencing MOO").  Before trial, the United States moved to offer evidence of three events that included evidence of other wrongs or acts pursuant to rule 404(b) of the Federal Rules of Evidence.  See Amended Motion in Limine to Introduce Evidence Pursuant to Federal Rule of Evidence 404(b), filed September 10, 2014 (Doc. 56)("404(b) Motion").

**1.      The 404(b) Incidents and Trial.**

The Court has previously summarized the three incidents:

> In August, 2013, Lisa Gonzales, a Los Alamos, New Mexico, resident, and her husband were driving south on Highway 285 in Rio Arriba County.  A vehicle pulling a camper was in front of them and was driving below the speed limit.  There was not enough room to pass the vehicle, so Gonzales' husband continued to drive behind the vehicle.  A pickup, with no law enforcement markings, pulled onto the highway behind Gonzales, caught up to her vehicle, and began tailgating her.  The vehicle with the camper turned off the highway, so Gonzales' husband increased his speed to the speed limit of fifty-five miles-per-hour.  The pickup continued tailgating in an aggressive manner for a long time. Emergency lights, which were not visible earlier, were activated on the pickup. Gonzales' husband prepared to pull over because of the emergency lights, but the road was too narrow and did not have a shoulder.  Gonzales' husband saw a dirt road ahead, and prepared to pull over onto the dirt road by slowing down and engaging his turning signal.   Before reaching the dirt road, the pickup "aggressively pulled up alongside" Gonzales' vehicle, occupying the left-hand lane that is designated for traffic coming from the other direction.  Through the passenger-side window of the pickup, Rodella yelled for Gonzales to "pull the fuck over," while pointing his finger at them.  Gonzales' husband "proceeded to the dirt road and pulled over as soon as possible."
>
> Rodella parked the pickup in front of Gonzales' vehicle.  Rodella parked the pickup in a manner that blocked in Gonzales' vehicle and partly obstructed

Highway 285 with the back end of the pickup.  Rodella exited the pickup, wearing plain clothes, and not displaying a badge or other law enforcement markings. Rodella wore a holster with a gun at his hip and walked toward Gonzales' vehicle with his hand on the gun.  Gonzales was terrified, because a man with a gun had blocked their vehicle from accessing Highway 285, and because there was no indication -- other than the "multi-colored lights on the visor" of the pickup -- that Rodella or the vehicle were affiliated with law enforcement.  When Rodella reached the window of the vehicle, he displayed his badge.  Rodella asked why Gonzales' husband did not pull over when Rodella told him to do so, and Gonzales' husband told Rodella that it was not safe to pull over until he reached the dirt road.  Gonzales' husband handed Rodella his license and registration, which indicated that he lived in Los Alamos.  Rodella told Gonzales' husband: "You don't speed in my county."  Rodella did not issue Gonzales or her husband any citation.

On or about March 28, 2013, Jacob Ledesma, a forty-year-old engineering consultant from Las Cruces, New Mexico, was driving on Highway 84 in Rio Arriba County.  Ledesma was driving the speed limit when a brown SUV, with no law enforcement markings, turned onto the highway in front of oncoming traffic and Ledesma.  The SUV drove slowly and caused the traffic to slow down. Passing was permitted in that part of the highway, and Ledesma moved into the other lane and passed the SUV.  The SUV activated emergency lights, which were concealed in the vehicle's front grill.  Ledesma pulled over to the side of the road, and the SUV pulled over behind him.

Rodella stepped out of the SUV, wearing plain clothes without a badge displayed.  Rodella asked Ledesma: "Do you know who I am?"  Ledesma told Rodella that he did not, so Rodella pulled out his driver's license and handed it to Ledesma.  Ledesma responded by stating: "So?  I have a driver's license, too." Rodella became angry, reached into his pocket, pulled out his badge, and threw it at Ledesma.  Ledesma told Rodella that he did not know who Rodella was, that Rodella was not in a marked police unit, and that, if Rodella did not get a marked police unit there immediately, he was going to leave.  Rodella summoned a sheriff deputy, who arrived in a marked unit and wrote Ledesma tickets "for passing in a no-passing zone and failing to sign his registration."  Ledesma protested to the deputy, and the deputy replied: "He's my boss."  The tickets were dismissed two weeks later.  Ledesma revisited the area and confirmed that passing was prohibited on that stretch of highway.

Yvette Maes is a fifty-two year-old woman from Rio Arriba County.  In January, 2014, Maes was driving home at night when a vehicle rapidly approached her vehicle from behind and began tailgating her.  The vehicle passed Maes, and she flashed her high-beam headlights at it.  The vehicle activated emergency lights, and Maes pulled over to the side of the road.  The other vehicle pulled over on the side of the road, a short distance in front of Maes' vehicle.

Rodella exited the vehicle, appearing visibly shaken, and approached Maes' vehicle.

Rodella asked Maes what "she thought she was doing by flashing her lights at him" and told her that "flashing high beams is a form of road rage." Maes responded by telling Rodella that tailgating is also a form of road rage. Rodella asked Maes why she did not pull over on the side of the road, and Maes told him that "it was dark and she could not tell who was driving behind her." Rodella informed Maes that he was responding to an emergency, and Maes said that if there was an emergency, Rodella "should have turned on his emergency lights and passed her." Rodella "asked Maes if she should go to jail," and Maes said that, if Rodella "though it was appropriate, then he should take her to jail." Rodella then walked back to his car and drove away.

Memorandum Opinion and Order at 3-7, filed September 21, 2014 (Doc. 93)("404(b) MOO")(alterations omitted)(citations omitted)(footnote omitted)(headings omitted).

The Court granted the 404(b) Motion, permitting the United States to introduce evidence of the three prior incidents. See 404(b) MOO at 37. To ensure that the United States used the evidence for appropriate purposes -- proving that the Rodella acted willfully -- the Court required the United States to specifically state, during closing arguments, the purposes for which the jury could use the evidence of the three prior incidents. See 404(b) MOO at 37.

The Court further orders . . . the United States to state verbatim, during closing arguments:

(i)     Rodella's motive and intent for pursuing Tafoya was to express his road rage, punish disrespect, and force Tafoya to submit to his authority and not to enforce any traffic law.

(ii)    Rodella had a plan to drive in a threatening manner towards other motorists, and if he succeeded in provoking any disrespectful act, force the motorist to submit through a display of his authority. The traffic encounters are part of a common plan Rodella had to require the citizens of Rio Arriba to submit to his authority.

(iii)   Rodella did not make a mistake or accidently forget that his identity was not apparent to all motorists when he pursued Tafoya in a private Jeep.

404(b) MOO at 37 (emphasis in original).  Finally, the Court noted that, if Rodella requested, it would provide the jury with an appropriate limiting instruction.  See 404(b) MOO at 37 ("Additionally, upon Rodella's request, the Court will give the jury an appropriate limiting instruction.").  Rodella never proposed a limiting instruction.  See Stipulated Jury Instructions, filed September 10, 2014 (Doc. 59)("Stipulated Jury Instructions"); Defendant's Proposed Jury Instructions, filed September 10, 2014 (Doc. 63)("Rodella Jury Instructions").  Rodella, however, stated that he wanted the Court to include in the jury instructions the limiting instruction, which the Court drafted.  See Transcript of Trial at 1003:2-10 (taken Sept. 25, 2014)(Oliveros, Court), filed January 23, 2015 (Doc. 177)("Trial Day 4 Tr.").

At trial, the United States briefly mentioned the three prior incidents during its opening statement.

> And the United States is going to bring three other witnesses, three other victims of the violence of this defendant.  They have stories to tell you.  At the end of the trial, you'll be instructed why they were brought.  One purpose that is permissible is that the defendant's motive and intent for pursuing Michael Tafoya was to express his road rage, punish, disrespect -- remember that -- what the hell are you doing, window gesture, that he made -- and forced Tafoya to submit to his authority, and not to enforce any traffic law.
>
> That wasn't the intent.  And that is why those three people will come to testify to you.  That is -- the evidence is going to show you, very simply put, that the defendant knew he was doing wrong, and he chose to do wrong anyhow.

Transcript of Trial at 36:15-37:5 (taken Sept. 22, 2014)(Neda), filed January 23, 2015 (Doc. 174).  The United States called sixteen witnesses in the following order: (i) Tafoya, the victim; (ii) Vince Crespin, a Rio Arriba County Under-Sherriff; (iii) Randy Sanchez, a New Mexico State Patrolman; (iv) Andy Gutierrez, a New Mexico State Police Sergeant; (v) Mark Thompson, a witness to the incident; (vi) Veronica Quintana, a 911 dispatcher; (vii) Andrea Salazar, a senior secretary at the First Judicial District Attorney's Officer; (viii) David Backlund,

a Federal Bureau of Investigation ("FBI") agent; (ix) Tiffany Smith, an FBI Forensic Examiner; (x) John W. Howard, an FBI agent; (xi) Eliot Guttmann, a Department of Public Safety law-enforcement instructor; (xii) Brian Cross, another law-enforcement instructor; (xiii) Maes; (xiv) Ledesma; (xv) Rene Dominguez, a friend of Tafoya; and (xvi) Gonzales.  Clerk's Minutes Before District Judge James O. Browning at 4-14, filed September 22, 2014 (Doc. 185)("Clerk's Minutes").

Maes, Ledesma, and Gonzales gave testimony that was substantially similar to the United States' summary of the incidents in the 404(b) Motion.  Rodella cross-examined each witness. During their direct and redirect examinations, Rodella made eight objections, none of which challenged the propriety of the 404(b) evidence.  See Transcript of Trial at 621:9-622:1 (taken Sept. 24, 2014)(Neda, Gorence, Court), filed January 23, 2015 (Doc. 176)("Trial Day 3 Tr.")(objecting to publication of newspaper article); id. at 634:10-18 (Neda, Gorence, Court)(objecting to hearsay statement); id. at 635:12-17 (Peña, Gorence, Court)(objecting to hearsay); id. at 637:4-12 (Peña, Gorence, Court)(objecting to hearsay); id. at 638:19-20 (Gorence, Court)(objecting to relevance of Ledesma returning to scene of the incident); id. at 686:13-18 (Neda, Gorence, Court)(objecting to hearsay); id. at 694:20-24 (Neda, Gorence, Court); id. at 695:14-19 (Gorence, Court)(objecting to lack of foundation).  By and large, Rodella did not object at trial to the substance or details of their testimony.

The parties agreed that the Court would give its final instructions to the jury before the parties' closing arguments.  The Court gave the following limiting instructions to the jury:

**INSTRUCTION NO.2**

. . . .

       You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to

you.  You must not substitute or follow your own notion or opinion as to what the law is or ought to be. It is your duty to apply the law as I explain it to you, regardless , to its ears,

You have heard evidence of other act or wrongs engaged in by Mr. Rodella.  You may consider that evidence only as it bears on Mr. Rodella's motive, intent, plan, knowledge, absence of mistake or accident, and for no other purpose.  Specifically, the government contends that this evidence proves:

(i)     Mr. Rodella's motive and intent for pursuing Michael Tafoya was to express his road rage, punish disrespect, and force Mr. Tafoya to submit to his authority and not to enforce any traffic law.

(ii)    Mr. Rodella had a plan to drive in a threatening manner towards other motorists, and if he succeeded in provoking any disrespectful act, force the motorist to submit through a display of his authority.  The traffic encounters are part of a common plan that Mr. Rodella had to require the people of Rio Arriba County to submit to his authority.

(iii)   Mr. Rodella did not make a mistake or accidently forget that his identity was not apparent to all motorists when he pursued Mr. Tafoya in a private Jeep.

Of course, the fact that Mr. Rodella may have previously committed an act similar to the one charged in this case does not mean that Mr. Rodella necessarily committed the act charged in this case.

. . . .

## INSTRUCTION NO. 18

You are here to decide whether the government has proved beyond a reasonable doubt that Mr. Rodella is guilty of the crimes charged. Mr. Rodella is not on trial for any act, conduct, or crime not charged in the indictment. . . .

Court's Final Jury Instructions (Given)(without citations) at 3, 9, 27, filed September 26, 2014

(Doc. 130)("Jury Instructions").

During closing arguments, the United States discussed the three incidents.  In its initial

closing argument, the United States began by stating that Rodella has a distorted ego that results

in uncontrollable aggression; it then described the Maes incident.  See Transcript from Trial at

1036:19-1037:4 (taken Sept. 26, 2014)(Neda), filed January 23, 2015 (Doc. 178)("Trial Day 5

Tr.").

> Members of the jury, I began my opening statement with you by telling you that you're going to learn that the defendant is a man who criminally abuses his power, disrespects the badge.  He's a man who lets his distorted ego lead to aggression he cannot control.
> And then you met Yvette Maes, the woman who was traveling with her 15-year-old daughter, dead of night in the middle of nowhere, frightened to death by this man.  And what did she say about him?  "This man's ego is unbelievable."

Trial Day 5 Tr. at 1036:19-1037:4 (Neda).  The United States then described the incident for

which Rodella was charged and stated how it was similar to the Maes incident.

> Now, March 11 was just a regular day.  [Tafoya] had worked that day.  And after work he visited his grandfather.  And as he left his grandfather's, going down the dirt lane that he's always done, looked down the shoulder, like he's always done, and he knows the distances.  And he saw an SUV in an area at a distance where he knew it was safe for him to enter because it's 35 miles per hour.  And as he got onto 399, that SUV he had seen, all of a sudden bam, on his tail.  Boy, is that familiar, considering what else you've heard.  Remember Ms. Yvette Maes?

Trial Day 5 Tr. at 1038:24-1039:10.  At this point, five minutes into the United States' closing

argument, Rodella objected to the United States' reference to the Maes incident and requested

the Court to instruct the jury that the United States could not compare the two incidents.  See

Trial Day 5 Tr. at 1039:15-1040:3 (Gorence, Court).  The Court was reluctant to start instructing

the jury, five minutes into the United States' closing argument, especially considering that the

United States had the rest of its closing to follow the Court's instructions in the 404(b) MOO.

The Court thus did not provide the jury with an instruction, but told the United States to be

careful with its use of the prior incidents, to tie the incidents to the willfulness element, and to

clean up its closing.  See Trial Day 5 Tr. at 1039:17-1040:5 (Gorence, Court).[1]

---

[1]The entire exchange is as follows:

MR. GORENCE:  This is improper use of a 404(b).

Later in its closing, the United States mentioned the Ledesma and Gonzales incidents when it argued that a law enforcement officer should not pull alongside a car that he or she is pursuing.  See Trial Day 5 Tr. at 1051:18-20 (Neda)("[The pursuit expert] also taught [Rodella], you're never to pull alongside a car in a pursuit.  Do you remember -- we'll get to Ms. Lisa Gonzales in a moment.").  Rodella did not object at this point.  The United States' initial closing lasted forty-two minutes.  See Trial Day 5 Tr. at 1065:17-23 (Neda, Court).  At the end of the United States' closing, Rodella objected to the United States' mentioning the prior incidents and asked the Court to declare a mistrial.  See Trial Day 5 Tr. at 1062:2-1063:17 (Gorence).  Rodella argued that the United States' use of the prior incidents was improper, that the United States did not attempt to clean up its closing argument, and that the United States disregarded the Court's order by not stating the three purposes which the Court said it must state.  See Trial Day 5 Tr. at 1062:2-1063:17 (Gorence).

> MR. GORENCE:  Two things, Your Honor, first, I would ask for a judicial instruction that Ms. Neda's comments about what happened with Ms. Gonzales was improper and violated your ruling.  She didn't remotely, quote, "clean it up."  She was using that to say that prior -- you have very strict parameters about what it can be used for.  Her statement: Does that sound

---

> THE COURT:  [To the United States] Be careful with it.
>
> MR. GORENCE:  I would . . . like to make my record.  The Court says very clearly what the 404(b) could be heard for.  Of course, we have the whole closing to hear it.
>
> THE COURT:  Be careful about comparing the incidents to this incident, and tie it to the willfulness.
>
> MR. GORENCE:  I'm actually objecting, Your Honor.  I'm asking that you give an instruction right now that that can't be compared.
>
> THE COURT:  You clean it up.  And we'll see how it goes.

Trial Day 5 Tr. at 1039:15-1040:5 (Gorence, Court).

familiar, to establish if a constitutional violation is exactly the type of character evidence that 404(b) prohibits.  I was expecting that cleanup -- but it never occurred -- to say you can't consider the fact that allegedly the Sheriff pulled up next to him.  Of course, that wasn't even a chase.  But she was using that for a complete improper purpose.  And it wasn't cleaned up.  And I'm asking the Court to do that.

Next -- and I know she has a rebuttal -- she hasn't remotely stated the three things in her closing which she has to; particularly, I would say that one is close, the first one.  The second one about this was a part of a common plan Rodella had to require the citizens of Rio Arriba to submit to his authority.  And she didn't remotely say anything about mistake or accidentally forget that the identity was not apparent to all motorists.

The problem is I haven't heard -- and I'd like to be able to respond -- because, of course, that's my one opportunity in closing, and it seems like it's an apparent disregard for the Court's order to save this for rebuttal, when I can't even rebut or comment on what she said, it's fundamentally unfair.

So at this point I think you can cure the first through an instruction.  There was an improper statement about what happened to Ms. Gonzales and Maes.  She actually said that started later on with Ms. Maes, as well as Mr. Olson just pointed out.

At this point, I'm moving for a mistrial based on the improper use of 404(b), and the disregard Ms. Neda had for the Court's order that now can't be fixed.  Because even to say it in rebuttal doesn't allow me the chance to comment on it.

Trial Day 5 Tr. at 1062:2-1063:17 (Gorence).

The Court noted that it was concerned with the United States' closing argument and that the United States did not follow its instructions from the 404(b) MOO.  See Trial Day 5 Tr. at 1063:18-19 (Court).  The United States responded by stating that it would -- in rebuttal -- clear up its argument and follow the Court's order by stating the evidence's three purposes.  See Trial Day 5 Tr. at 1063:20-1064:14 (Neda, Court).  The Court rejected the United States' plan and told the United States that it needed to tell the jury the three purposes for which it could use the evidence before Rodella presented his closing argument.  See Trial Day 5 Tr. at 1064:3-4 (Court); id. at 1064:15-23 (Neda, Court).  The Court noted that, if the United States did not clean

up its closing and tell the jury the proper purposes for which it could use the prior incidents, the

Court would need to give a limiting instruction.  See Trial Day 5 Tr. at 1064:25-1065:2 (Court);

id. at 1065:9-16 (Court).

> THE COURT:  And make it clear [the jury] can use [the other incidents]
> only for purposes of determining willfulness.   You can turn it into
> argumentative -- after you do what you've got to do to clean it up, you can make
> it argumentative.  I'm not taking that away from you.  But if you don't give them
> that, then  I'm going to have to come back, given what you said in the opening
> portion, and give them a limiting instruction.

Trial Day 5 Tr. at 1065:9-16 (Court).  The Court brought the jury back into the courtroom, and

the United States told the jury that it could use evidence of the prior incidents only for specific

purposes and then read the purposes from the 404(b) MOO.   See Trial Day 5 Tr. at

1067:16-1069:7 (Neda).  The United States put the Court's Instruction Number 7 on the ELMO

so that the jury could read the instruction while hearing it.  The United States said, in full:

> MS. NEDA:  Thank you, Your Honor. Members of the jury, in rebuttal I
> will discuss Ms. Maes, Gonzales, and Ledesma, Mr. Jacob Ledesma.  But I
> mentioned Ms. Maes in my opening -- I'm sorry, my initial closing.  So I want
> you to look at Instruction No. 7, so you know what you're allowed to consider
> when you're considering the testimony of Ms. Maes, Ms. Gonzales, and
> Mr. Ledesma.
>
> The Court has instructed you already.  You heard evidence of other acts of
> wrong engaged in by Mr. Rodella.  You may consider that evidence only as it
> bears on Mr. Rodella's motive, intent, plan, knowledge, absence of mistake, or
> accident, and for no other purpose.
>
> Specifically, the Government contends that this evidence proves -- and
> there are three ways the United States is permitted to use the evidence of those
> three people, Ms. Gonzales, Mr. Ledesma, and Ms. Maes, and they are as follows:
> Mr. Rodella's motive and intent for pursuing Michael Tafoya was to express his
> road rage, punish, disrespect, and force Mr. Tafoya to submit to his authority, and
> not to enforce any traffic law.
>
> Mr. Rodella had a plan to drive in a threatening manner towards other
> motorists.  And if he succeeded in provoking any disrespectful act, force the
> motorist to submit, through a display of his authority.  The traffic encounters are
> part of a common plan that Mr. Rodella had to require the people of Rio Arriba

County to submit to his authority.   Mr. Rodella did not make a mistake or accidentally forget that his identity was not apparent to all motorists, when he pursued Mr. Tafoya in a private vehicle.

And, of course, the fact that Mr. Rodella  may have previously committed an act similar to the   one charged in this case, does not mean Mr. Rodella necessarily committed the act charged in this case.  You'll hear that again -- or see it at least -- and I read it to you now because I will be discussing those three people.

Trial Day 5 Tr. at 1067:16-1069:6

During Rodella's closing, he discussed the other incidents to explain how his conduct was not unconstitutional.  See Trial Day 5 Tr. at 1101:18-11:03:11 (Gorence).  He stated that, in the Maes incident, he drove behind Maes until he could pass her, and that, when she flashed her bright headlights into his car, he pulled her over, told her she "can't do that," and gave her a warning.  Trial Day 5 Tr. at 1102:12-18 (Gorence).  Concerning the Ledesma incident, Rodella asserted that Ledesma did not complain to anyone about his ticket, but, instead, admitted his guilt and paid the fine.  See Trial Day 5 Tr. at 1102:19-24 (Gorence).  For the Gonzales incident, Rodella told the jury that he saw Gonzales speeding, attempted to stop her, and, when she refused to pull her vehicle onto the side of the road, he used some harsh language to get her to stop the car.  See Trial Tr. at 1102:25-1103:6 (Gorence).  He also addressed the United States' assertion that Rodella had a plan to commit road rage and subject other drivers to his authority by calling the United States' assertion "ludicrous."  Trial Day 5 Tr. at 1096:7-9 (Gorence)("The Government says it's an ongoing plan to terrorize the community that's elected him.  That's kind of ludicrous to begin with.").  Rodella told the jury that it could use the evidence of the other incidents only for a  limited purpose.  See Trial Day 5 Tr. at 1102:9-11 (Gorence)("And that's why you have this very strict limiting instruction, which is -- and Ms. Neda read it, and you can go over it again."); id. at 1103:7-11 (Gorence)("But for the very limited purpose you have, you

can see that that doesn't constitute a plan by the sheriff to terrorize the citizens that have elected him in the county.  But it is what it is, and it certainly doesn't reflect in this case.").

After Rodella gave his closing argument, during the rebuttal, the United States brought up the three incidents again.  The United States talked about the charged incident involving Tafoya and then transitioned to the three prior incidents by saying: "What about the defendant's other victims?"  Trial Day 5 Tr. at 1128:4 (Neda).  The United States first summarized the three incidents without discussing how they relate to the current case.  See Trial Day 5 Tr. at 1128:5-1132:21 (Neda).  After the United States related the events from the three incidents, it tied them to the current case in the following manner:

> So when you're thinking about Michael Tafoya, I'm going to ask you to think about Yvette Maes, and think about Lisa Gonzales.  It's been months and months, a year to Lisa Gonzales.  And a gun wasn't pointed at their heads.  How do you think Michael Tafoya felt?  Lisa Gonzales and her husband were so upset after that, they had to sit in their car for five minutes, if you remember, before they could even continue on their drive home.
>
> He said he's not concerned about the community.  That's his mindset.  Not concerned about Maes, her daughter; Mr. Ledesma, his family; Lisa Gonzales; certainly not Michael Tafoya, willing to put a gun to his head to satisfy his ego.  His ego trumps all.  And this time it has caught up to him.

Trial Day 5 Tr. at 1132:22-1133:11 (Neda).  During the rebuttal, Rodella did not object to the United States' use of the three prior incidents.  The United States' rebuttal took about twenty minutes.  See Clerk's Minutes at 20.  When the United States finished its rebuttal, the Court looked at Rodella's counsel to see if he would object or ask for an instruction.  He did not; instead, he looked at his co-counsel and shrugged.  The Court would have given the limiting instruction at that moment once more if Rodella requested it.  The Court was reluctant, however, to, sua sponte, raise the three prior incidents without a request from Rodella; he might not want the last words the jury hears in the courtroom to be about these three incidents.  Rodella

obviously did not want to bring up these three previous incidents, and the Court did not want to hurt Rodella's case on its own.  Rodella has one of the district's best criminal defense lawyers, and he objects frequently; if he was not going to object at this point, the Court should not try to help him with another limiting instruction.

After closing arguments, on the fifth day of trial, the Court sent the jury to deliberate at 11:23 a.m.  See Clerk's Minutes at 20.  The Court provided the jury with a hard copy of the jury instructions to take back to deliberations.  The Court received a note from the jury at 3:53 p.m. to which the Court responded.  See Clerk's Minutes at 20.  The note asked the Court whether a badge is sufficient to identify an officer as an officer of the law.  See Clerk's Minutes at 22.  The Court responded by telling the jury that, if the question was important to their deliberations, they would need to resolve the question themselves, and by directing the jury to Instruction Number 13, which concerned a law enforcement officer's requirement to be in uniform to perform certain duties.  See Clerk's Minutes at 22; Jury Instructions at 16.  At 5:44 p.m., the jury informed the Court that it reached a verdict, which the Court read at 5:51 p.m.  See Clerk's Minutes at 20-21.[2]

On January 12, 2015, the Court sentenced Rodella to 121-months imprisonment.  See Sentencing MOO at 95-96.  The Court worked hard to finish writing opinions explaining its rulings in the case, and, on February 6, 2015, the Court entered judgment.  See Judgment in a Criminal Case, filed February 6, 2015 (Doc. 192).  The Court acted quickly to enter the judgment so that Rodella could appeal, and so that he could be designated to a Bureau of Prisons ("BOP")

---

[2]The jury deliberated for over five hours.  While this amount of time is not particularly lengthy for a four-and-a-half-day trial, it also is not particularly short.  The Court has had some juries return a verdict almost immediately, even before the Court had time to take off its robe. Some judges say, as a rule of thumb, that a jury will likely deliberate for an hour and a half for each day of trial.  The trial, here, lasted four and a half days.  Under this rule of thumb, deliberations should have lasted a little less than seven hours.  The five hours that the jury took to deliberate thus falls within a normal deviation from that rule of thumb and, in the Court's experience, was not particularly short.

facility, which usually takes place sixty days after the Court enters judgment.  Rodella filed his notice of appeal on the same day that the Court entered judgment.  See Notice of Appeal, filed February 6, 2015 (Doc. 194).

      2.      **The Motion.**

Rodella filed the Motion on February 6, 2015, requesting the Court to release him from custody pending his appeal.  See Motion at 1.  Rodella argues that his appeal presents at least one substantial question concerning the Court's admission of evidence of the prior incidents at trial and the United States' use of those incidents during closing argument.  See Motion at 1.  He contends that, if the United States Court of Appeals for the Tenth Circuit decides in his favor on either of those two issues, his conviction will likely be reversed.  See Motion at 1.  He also contends that his case presents exceptional reasons for release, including the strength of his appeal, his poor health, the low risk that he will commit further acts of violence if released, the danger he faces while incarcerated, and his family's needs.  See Motion at 1.

Rodella asserts that a defendant must ordinarily show four things to be released pending appeal: (i) that he is not likely to flee or pose a danger to any other person or to the community if released; (ii) the appeal is not for the purpose of delay; (iii) the appeal raises a substantial question of law or fact; and (iv) a favorable decision on that substantial question would likely result in a reversal or an order for a new trial.  See Motion at 2 (citing United States v. Affleck, 765 F.2d 944, 953 (10th Cir. 1985)(en banc); United States v. Vigil, No. CR 05-2051 JB, 2007 WL 766345 (D.N.M. Feb. 16, 2007)(Browning, J.); 18 U.S.C. §§ 3142(f)(1)(A), 3142(b)(2), 3145(c)).  Rodella maintains that he is not a flight risk.  See Motion at 2.  He contends that he has deep ties to northern New Mexico, and that he appeared at every hearing and every day of trial despite facing a substantial sentence.  See Motion at 2.  He notes that he is willing to wear a

tracking device if the Court so orders.  See Motion at 2-3.  Rodella argues that he is not a danger to the community, as the absence of a criminal history and the support letters the Court received in connection with his sentencing shows.  See Motion at 3.  He asserts that he will not be able to commit a similar crime, because he is no longer a law enforcement officer.  See Motion at 3. Rodella also argues that his appeal is not for the purpose of delay, which the fact that he pleaded not guilty, raised a number of issues at trial, and plans to vigorously pursue his appeal, shows. See Motion at 3.

Rodella argues that the Court's admission of the prior incidents and the United States' misuse of the evidence in closing present a substantial questions that, if resolved in his favor, would result in a reversal.  See Motion at 3.  He contends that a substantial question is one of substance, and that is close or that could be decided the other way.  See Motion at 3.  Rodella contends that a substantial question must be so integral to the merits of the conviction that a contrary appellate holding will likely require reversal or a new trial.  See Motion at 4.  He asserts that the Court does not need to find that it committed reversible error, but only that the question is close and could go the other way.  See Motion at 4.

Concerning evidence of the three prior incidents, Rodella argues that the limitations that the Court placed on the evidence were inadequate, because the issues of motive, intent, plan, and absence of mistake or accident were either not in dispute or were linked to inferences that depended on propensity.  See Motion at 4-5.  Rodella maintains that 404(b) evidence must be relevant to a disputed issue other than propensity and that it is not enough for the United States "to recite a non-propensity purpose for the evidence."  Motion at 5.  He asserts that 404(b) evidence is admissible only if it is relevant to a permissible purpose and the relevance does not depend on the defendant likely acting in conformity with an alleged character trait.  See Motion

at 5 (citing <u>United States v. Commanche</u>, 577 F.3d 1261, 1267 (10th Cir. 2009); <u>United States v. Gomez</u>, 763 F.3d 845, 856 (7th Cir. 2014)(en banc)).

Addressing the purposes of motive and intent, Rodella argues that courts have cautioned against admitting 404(b) evidence to prove intent, because intent may blend with propensity. <u>See</u> Motion at 6 (citing <u>United States v. Stacy</u>, 769 F.3d 969, 974 (7th Cir. 2014); <u>United States v. Miller</u>, 673 F.3d 688, 700 (7th Cir. 2012)).  He argues that the link between his motive and intent during the Tafoya incident, and the prior incidents, impermissibly depended on him acting in conformity with an alleged character trait.  <u>See</u> Motion at 6.  Rodella contends that the intent that the prior incidents show is merely that he acted one way before the charged incident, therefore he acted the same way again, which is not a permissible purpose.  <u>See</u> Motion at 7.  He asserts that intent is not a permissible purpose in this case, because it impermissibly relies on a propensity inference.  <u>See</u> Motion at 7.

Concerning the United States' asserted purpose of showing a plan, Rodella argues that there was no evidence of a plan, because plan evidence must show that the defendant was part of a pre-arranged plan or scheme.  <u>See</u> Motion at 8-9 (citing <u>United States v. Smalls</u>, 752 F.3d 1227, 1239 n.5 (10th Cir. 2014)).  He contends that there was nothing pre-arranged about his encounters with Tafoya, Maes, Ledesma, or Gonzales, and that "[w]hat the government called a 'plan' was just propensity by another name."  Motion at 8.  Rodella asserts that the Court's description of the word "plan" could be replaced by the word "propensity" without changing its meaning, and that the jury understood the word plan to mean that Rodella had a propensity for driving in a threatening manner and acting like a jerk toward other motorists if they acted disrespectfully.  Motion at 8.  In regards to absence of mistake or accident, Rodella contends that he never asserted that he made a mistake about Tafoya or that he accidently forgot that his

identity as a law enforcement officer was not apparent.  See Motion at 8 (citing United States v. Johnson, 458 F. App'x 727, 731-32 (10th Cir. 2012)(unpublished)).  Rodella argues that the United States cannot erect a straw man as a pretext for introducing highly prejudicial evidence under rule 404(b).  See Motion at 8.

Rodella argues that the Court should have excluded the other-act evidence under rule 403 of the Federal Rules of Evidence, because the evidence was extraordinarily prejudicial.  See Motion at 9.  He contends that 404(b) evidence tends to distract the trier of fact from the main question of what actually happened on a particular occasion.  See Motion at 9 (citing United States v. Caldwell, 760 F.3d 267, 284 (3d Cir. 2014); United States v. Briley, 770 F.3d 267, 277 (4th Cir. 2014)).  Rodella asserts that the United States increased the prejudice from the other-act evidence in several ways.  See Motion at 9.  First, Rodella contends that the United States placed the evidence at the end of its case, where it would have the greatest impact under the recency principle.  See Motion at 9 (citing Ryan Patrick Alford, Catalyzing More Adequate Federal Habeas Review of Summation Misconduct: Persuasion Theory and the Right to an Unbiased Jury, 59 Okla. L. Rev. 479, 513-15 (2006)).  Second, Rodella asserts that the United States elicited unnecessary details about how Maes, Ledesma, and Gonzales felt when Rodella accosted them.  See Motion at 9-10.  Third, Rodella argues that the United States misused the evidence in closing argument.  See Motion at 10.  Rodella notes that, while the Court attempted to mitigate the evidence's prejudice through a limiting instruction, the instruction had little effect, especially considering the fact that the jury could not consider the 404(b) evidence without drawing an impermissible propensity-based inference.  See Motion at 10 (citing Krulewitch v. United States, 336 U.S. 440, 453 (1949)(Jackson, J., concurring)).

Rodella also argues that the evidence had little probative value.   See Motion at 10. Rodella asserts that the three incidents were dissimilar to the Tafoya incident, because they did not involve the use of force, they did not involve a private vehicle, they did not involve a civilian driver, and they did not lead to an arrest.   See Motion at 10.   He contends that the only similarity between the prior incidents and the Tafoya incident is that they all show that Rodella acted like a jerk.   See Motion at 10-11.   Rodella argues that the purposes for the 404(b) evidence were largely undisputed and that, if an issue is not seriously disputed, evidence that risks unfair prejudice should not be admitted.   See Motion at 11 (citing United States v. Trent, 767 F.3d 1046, 1050 (10th Cir. 2014)).   He maintains that he did not contend that his conduct concerning Tafoya was the result of a mistake or accident.   See Motion at 11.   He argues that the United States' plan argument is not a serious argument, because there is no evidence of a plan to accost motorists, and because the United States never used the word plan during closing, outside of reading the Court's script from the 404(b) MOO.   See Motion at 11.   Rodella concedes that -- unlike mistake, accident, or plan -- motive and intent were at issue in the trial, but that those issues were of secondary importance.   See Motion at 11.   He argues that the central dispute at trial concerned the factual issues of what happened during the charged incident.   See Motion at 11-12.   Rodella argues that, if the jury found that he acted in the manner that Tafoya contended he did, "the jury could readily have inferred that he acted willfully."   Motion at 12.   He asserts that he did not directly contest willfulness, but, instead, that he presented a different factual scenario than Tafoya's and that, although willfulness was a contested issue, it was subsumed in the fight over the underlying facts.   See Motion at 12.   Rodella contends that the prior incidents were unnecessary for the jury to have a complete understanding of the charged incident, "because there was ample direct evidence of the Tafoya incident."   Motion at 12.

Rodella asserts that, during closing arguments, the United States disregarded the limitations that the Court placed on the evidence.  See Motion at 13 (citing United States v. Richards, 719 F.3d 746, 763-65 (7th Cir. 2013)).  Rodella argues that the United States emphasized the other-act evidence by highlighting it at the beginning of its closing and at the end of its rebuttal.  See Motion at 13.  He contends that the United States began its closing argument by stating that Rodella had a distorted ego that leads to aggression before discussing the Maes incident to show his ego and then contrast it with Tafoya's character.  See Motion at 13.  Rodella argues that the United States' use of the Maes incident to contrast Tafoya's character was a forbidden purpose.  See Motion at 14.  He asserts that, when the United States referenced the Maes incident again, he objected, and that the Court admonished the United States to clean up its closing and to tie the prior incidents to willfulness.  See Motion at 14.  Rodella argues that the United States ignored the Court's directive by using the Gonzales incident to make a propensity argument.  See Motion at 14.

Rodella contends that, after the United States' first closing, he objected to the United States' use of the other-act evidence, requested an instruction that the United States' comments were improper, and moved for a mistrial.  See Motion at 14.  He asserts that the Court did not give the requested instruction or grant a mistrial, but instead directed the United States to clean up its closing before Rodella's closing by telling the jury the purposes for which it could use the prior incidents.  See Motion at 14-15.  Rodella states that, during rebuttal, the United States ignored the United States' limitations that it placed on the evidence by referring to Maes, Ledesma, and Gonzales as other victims, and then focusing on Rodella's character and the effect that his conduct had on Maes, Ledesma, and Gonzales.  See Motion at 15.  He argues that the United States' argument did not have anything to do with the purposes for which the other-act

evidence could be admitted and that it served only to paint Rodella as a bad person who needlessly inflicted emotional distress on Maes. See Motion at 15-16. He maintains that the United States' closing argument was merely an exhortation to the jury to punish Rodella, because he is a bad person who inflicts emotional trauma on motorists in Rio Arriba County. See Motion at 16-17.

Rodella argues that admission of the 404(b) evidence was not a harmless error and that a ruling in his favor on that issue will result in a new trial. See Motion at 17. He contends that introduction of the other-act evidence influenced the outcome of the trial, because of the United States' reference to Maes, Ledesma, and Gonzales as victims, because of the United States' use of the recency effect, because of the emotional testimony that Maes, Ledesma, and Gonzales gave, and because of the propensity-based arguments that the United States made. See Motion at 17. Rodella maintains that the jury reached a guilty verdict so swiftly that it could not possibly have carefully weighed the evidence related to the Tafoya incident. See Motion at 17-18.

Rodella maintains that, because he was convicted of a crime of violence, he must also show exceptional circumstances that are clearly out of the ordinary, uncommon, or rare. See Motion at 18 (citing United States v. Mutte, 383 F. App'x 716, 718 (10th Cir. 2010)(unpublished); United States v. Ganadonegro, No. CR 09-0312 JB, 2012 WL 1132166 (D.N.M. Mar. 14, 2012)(Browning, J.); United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.)). He asserts that there are a wide range of factors that a Court may consider in determining if exceptional circumstances exist and there are five exceptional reasons in this case. See Motion at 18. First, Rodella contends that he has an unusually strong chance of obtaining a reversal on appeal. See Motion at 18-19. Second, he

argues that his poor health constitutes an exceptional reason for being released pending appeal. See Motion at 19.  He asserts that his health has deteriorated since sentencing and that, while the BOP may be capable of providing him with necessary treatment, he is currently detained in the Torrance County Detention Facility, where he will remain for some time until he is designated and transported to a federal prison.  See Motion at 19.  Third, Rodella asserts that the nature of the Tafoya incident constitutes an exceptional circumstance, because the violence rose out of his role as a law enforcement officer, and, because he is no longer an officer, it is unlikely that he is a danger to anyone.  See Motion at 19-20.  Rodella contends that, because he poses a low risk of future danger, he is not the person for whom Congress intended the mandatory detention rule to apply.  See Motion at 20 (United States v. Garcia, 340 F.3d 1013, 1019 (9th Cir. 2003)).  Fourth, Rodella argues that, because he is a former law enforcement officer, he is exposed to exceptional risks and that he has received threats since being incarcerated.  See Motion at 20 (citing United States v. Koon, 6 F.3d 561, 568 (9th Cir. 1993)(Reinhardt, J., dissenting)).  Fifth, Rodella maintains that his family circumstances weigh in favor of release.  See Motion at 20 (citing United States v. Kaquatosh, 252 F. Supp. 2d 775, 778-79 (E.D. Wis. 2003); United States v. Franklin, 843 F. Supp. 2d 620, 623-24 (W.D.N.C. 2012)).  He contends that the important role that he plays in the lives of his mother and wife will cause his incarceration to be difficult for his family.  See Motion at 21.  Rodella argues that the combination of these five factors constitute exceptional reasons which make it unreasonable to incarcerate him while his appeal is pending. See Motion at 21.

The United States responded on February 23, 2015.  See United States' Response to Defendant's Motion for Release Pending Appeal (Doc. 195), filed February 23, 2015 (Doc. 209) ('Response').  The United States argues that a violent offender should be detained pending

appeal except when a defendant can satisfy 18 U.S.C. § 1343(b)(1)'s requirements and make a clear showing of exceptional reasons why his detention would be inappropriate. See Response at 1. The United States asserts that Rodella has not raised a substantial question that would likely result in a reversal and has not clearly shown that there are exceptional reasons why his detention is not appropriate. See Response at 1.

The United States argues that Rodella has not identified a substantial question. See Response at 2. It contends that the Court's admission of the 404(b) evidence and the United States' closing argument are two events, but are not questions. See Response at 2. The United States notes that a substantial question must be one that can properly be raised on appeal and that an event cannot be raised on appeal. See Response at 2 (citing United States v. Affleck, 765 F.2d at 952 n.13). It contends that United States v. Farr, 457 F. App'x 757 (10th Cir. 2012)(unpublished), is similar and that the Tenth Circuit held that, in determining whether a person should be granted bail pending appeal because of improperly admitted 404(b) evidence, the question is whether the district court abused its discretion in admitting the evidence. See Response at 2. The United States asserts that the proper standard of review is dispositive to resolving the Motion. See Response at 2.

The United States maintains that the Court did not abuse its discretion at trial, and that the Court does not abuse its discretion as long as its ruling is not arbitrary, capricious, or whimsical. See Response at 2 (citing United States v. Mares, 441 F.3d 1152, 1156 (10th Cir. 2006)). It contends that the Court's ruling was not arbitrary, capricious, or whimsical. See Response at 2-3. The United States asserts that in United States v. Farr the Tenth Circuit held that, because the district court recognized the burden which the United States had to prove to show willfulness, it did not abuse its discretion in admitting evidence under rule 404(b). See

Response at 3.  The United States states that the Court based its decision in part on the burden that the United States had to prove willfulness.  See Response at 3.  It notes that Rodella did not cite a single case in which a court found that the admission of 404(b) evidence raised a substantial question.  See Response at 3.  The United States argues that evidentiary rulings are normally not substantial questions.  See Response at 3.  It contends that, based on the number of evidentiary rulings a judge must make at trial, he or she will make some rulings with which another judge could differ, but that another judge may differ on a ruling is insufficient to raise a substantial question.  See Response at 3 (citing United States v. Powell, 761 F.2d 1227, 1233 (8th Cir. 1985)).

The United States argues that it is rare for a court to release a defendant pending appeal based on an issue that will be reviewed for abuse of discretion or plain error.  See Response at 3-4.  It contends that the Motion is merely a second-guessing of the 404(b) MOO, which the parties briefed and argued, and the Court wrote.  See Response at 4.  The United States argues that Rodella has not raised any new arguments to support the exclusion of the other incidents other than restating his arguments in a way that gives the slanted impression that rule 404(b) excludes evidence that shows propensity.  See Response at 4.  The United States contends that Rodella's assertion is contrary to law, because, as long as 404(b) evidence is introduced for a permissible purpose, it may have some propensity side effects.  See Response at 4 (citing United States v. Moran, 503 F.3d 1135, 1145 (10th Cir. 2007); United States v. Romero, No. CR 09-1253 JB, 2011 WL 1103862, at *12 (D.N.M. 2011)(Browning, J.)).  It argues that, even though 404(b) evidence may have a propensity effect, if the evidence satisfies the four factors from Huddleston v. United States, 485 U.S. 681 (1988), it is properly admitted, yet Rodella

never once mentions those factors, see Response at 5 (citing United States v. Cherry, 433 F.3d 698, 701 n.3 (10th Cir. 2005)).

The United States contends that the only new issue in the Motion is that Rodella is able to state, with the hindsight of trial, what issues were contested.  See Response at 5.  It contends that Rodella did not raise the issue of what was contested at trial or during closing arguments, and did not ask the Court to revisit its rulings from the 404(b) MOO.  See Response at 5.  The United States asserts that Rodella asked for each proper purpose to be given to the jury so that he could comment on them in closing.  See Response at 5-6.  It argues that, "rather than take the position that the United States could only argue certain purposes based on the evidence presented, Defendant made the tactical decision that he wanted the United States to present all the proffered purposes to the jury so that Defendant could critique them."  Response at 6.

The United States maintains that, even if Rodella raises a substantial question, he must prove that, if a decision is answered in his favor, the decision is likely to result in a reversal or a new trial, which means that harmless errors do not justify release pending appeal.  See Response at 6.  (citing United States v. Bilanzich, 771 F.2d 292, 299 (7th Cir. 1985); United States v. Bayko, 774 F.2d 516, 522 (1st Cir. 1985)).  The United States asserts that, if it resolves the 404(b) issue in Rodella's favor, it should apply the nonconstitutional harmless error standard, which means the Court should grant a release only if the improperly admitted evidence had a substantial influence on the outcome of the trial or if it generates a grave doubt concerning whether it had such an influence.  See Response at 6.  The United States contends that, in making this determination, the Court should review the entire record, including the context, timing, and use of the evidence and compare it to other properly admitted evidence.  See Response at 6-7 (citing United States v. Blechman, 657 F.3d 1052, 1067 (10th Cir. 2011)).

The United States argues that Rodella has not met his burden of comparing the 404(b) evidence with other properly admitted evidence and that Rodella's main argument at trial was for the jury to believe Rodella, Jr. over Tafoya.  See Response at 7.  The United States maintains that Rodella, Jr.'s credibility was thoroughly impeached at trial while Tafoya's remained intact.  See Response at 7.  It contends that the jury would have convicted Rodella regardless of the 404(b) evidence.  See Response at 7.

The United States argues that the Court should review its closing argument for plain error.  See Response at 8 (citing United States v. Taylor, 514 F.3d 1092, 1097 (10th Cir. 2008)).  It asserts that Rodella objected after the first portion of the United States' closing argument and that the Court required the United States to immediately tell the jury the purposes for which it could use the 404(b) evidence.  See Response at 8.  The United States maintains that, after that point, Rodella did not object to the Court's resolution of its first objection or to the United States' discussion of the prior incidents on rebuttal.  See Response at 8.  It contends that Rodella was satisfied with the Court's ruling and was not troubled by the rebuttal, because he did not give the Court another opportunity to address the 404(b) issue.  See Response at 8.  The United States asserts that the question which the Court must consider to be substantial is whether it was plain error for the Court to fail to issue a limiting instruction sua sponte.  See Response at 8-9.  It contends that plain error requires "(1) error, (2) that is plain, which (3) affects the defendant's substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings."  Response at 9 (quoting United States v. Baldridge, 559 F.3d 1126, 1135 (10th Cir. 2009)).  The United States asserts that, in reviewing improper remarks under a plain error standard, the Court should view the remarks in the context of the entire trial.  See Response at 9.  The United States argues that Rodella fails to show that, in light of the entire trial, the

United States' closing argument would likely cause a reversal or a new trial.  See Response at 9.

It argues that each of the cases to which Rodella cites involved an abuse-of-discretion review and

involved more egregious facts.  See Response at 9.

The United States maintains that Rodella cannot show exceptional circumstances that

would justify his release pending appeal.  See Response at 10.  It contends that Rodella's five

reasons, individually or collectively, do not constitute exceptional circumstances.  See Response

at 10.  The United States asserts that, while unusually strong chances of reversal may constitute

exceptional circumstances, those chances involve issues that an appellate court has not

previously decided or that involve a situation in which the conviction would be overturned on the

grounds that the retroactive extension of a statute of limitations was unconstitutional.  See

Response at 10.  The United States contends that those examples are distinguishable from the

current case, which does not concern a constitutional question, and which involves an issue that

the Tenth Circuit has considered on a number of occasions.  See Response at 10.

The United States argues that Rodella's health does not rise to the level of an exceptional

reason, because the Tenth Circuit requires a severe illness or injury and because Rodella's health

is fine, as the facts that he physically attacked Tafoya and ran for a second four-year term as

sheriff show.  See Response at 11.  It notes that Rodella's nurse practitioner reports that Rodella

does not have significant needs and that his health has improved since his incarceration.  See

Response at 11.  The United States asserts that the Tenth Circuit has stated that it is rare for a

health condition to constitute an exceptional reason.  See Response at 11.  It contends that a

chronic medical condition that is controlled by medication is not an exceptional circumstance.

See Response at 11 (citing United States v. Varney, No. CR 12-0009 ART/HAI, 2013 WL

2406256, at *1-2 (E.D. Ky. May 31, 2013)(Thapar, J.)).  In addressing the nature of the violent

act, the United States argues that the circumstances with which courts are concerned include a violent act that lacked an intent to injure, and did not involve a threat or injury to a person or circumstances, which were highly unusual, such as a mercy killing.  See Response at 12.  It contends that Rodella's crime involved a high-speed chase, an assault with a firearm, and a threat, and that violating another's constitutional rights under the color of law is not highly unusual.  See Response at 12.  The United States argues that Rodella's risk-of-future-violence argument is inapplicable and that Rodella was not reacting to an unusually provocative circumstance.  See Response at 12.

The United States maintains that Rodella's status as a law enforcement officer does not present an exceptional circumstance, because it is not exceptional for law enforcement officers to be sent to prison for civil rights offenses.  See Response at 12.  It asserts that law enforcement officers should not be shielded from the otherwise universally applicable effects of incarceration.  See Response at 13.  The United States contends that Rodella's reliance on a dissenting opinion from United States v. Koon is misplaced, because that case involved national media coverage and the defendant received extraordinary notoriety.  See Response at 13.  The United States asserts that Mitch Varley, Detention Management Inspector for the United States Marshals Service, has stated that Rodella has not made an official complaint of any threats, and that Rodella is currently under administrative segregation where he is housed alone and checked on every thirty minutes.  See Response at 13.

Finally, the United States argues that Rodella's family circumstances do not constitute an exceptional circumstance, and that personal and family hardships also do not ordinarily satisfy that requirement.  See Response at 13 (citing United States v. Velarde, 555 F. App'x 840 (10th Cir. 2014)(unpublished); United States v. Krantz, 530 F. App'x 609, 610 (8th Cir. 2013)

(unpublished); United States v. Lea, 360 F.3d 401, 403-04 (2d Cir. 2004); United States v.

Schmitt, 515 F. App'x 646, 647 (8th Cir. 2013); United States v. Cook, 42 F. App'x 803 (6th

Cir. 2002); United States v. Smith, 34 F. Supp. 3d 541, 554 (W.D. Pa. 2014)(Gibson, J.); United

States v. Miller, 568 F. Supp. 2d 764, 777 (E.D. Ky. 2008)(Reeves, J.); United States v. Green,

250 F. Supp. 2d 1145, 1149 (E.D. Mo. 2003)(Webber, J.); United States v. Lippold, 175 F. Supp.

2d 537, 540 (S.D.N.Y. 2001)(Sweet, J.); United States v. Rodriguez, 50 F. Supp. 2d 717, 722

(N.D. Ohio 1999)(Potter, J.)).  The United States asserts that Rodella's family circumstances of

caring for his wife, mother, and two children are not exceptional, especially considering that his

two children are adults and his mother has other family who can care for her.  See Response

at 14.  It maintains that exceptional reasons are not usually present in a given case and that

Rodella's five reasons are not exceptional to warrant release pending appeal.  See Response at 14

(citing United States v. Ganadonegro, 2012 WL 1132166, at *5).

The United States attached two electronic mail transmissions to its Response.  The first

attachment is from Jay Peterson, who is a nurse practitioner at Torrance County Detention and

who is taking care of Rodella's health.  See Electronic Mail Transmission from Mitch Varley to

John W. Howard at 1 (Feb. 18, 2015), filed February 23, 2015 (Doc. 209-1)("Peterson Email").

Peterson states that he screened Rodella on October 9, 2014, and that he identified sinusitis,[3] for

which he prescribed appropriate antibiotics.  See Peterson Email at 1.  Peterson states that

Rodella told him that he suffers from hypertension, hemochromatosis, gastric ulcer disease, and

joint pain.  See Peterson Email at 1.  He notes that he prescribed medicine for Rodella's joint

pain and gastric ulcer disease.  See Peterson Email at 1.  Peterson states that a chemistry test

---

[3]"Sinusitis . . . is inflammation of the sinuses resulting in symptoms . . . [that] include thick nasal mucous, nasal congestion, . . . pain in the face . . . fever, headaches, sore throat, and cough. . . .  It can be due to infection, allergies, air pollution, or structural problems in the nose." Sinusitis, Wikipedia.org, http://en.wikipedia.org/wiki/Sinusitis (last visited Apr. 11, 2015).

showed renal insufficiency, for which he adjusted Rodella's anti-hypertensive medicine, but that the test did not reveal any evidence of hemochromatosis.  See Peterson Email at 1.  He notes that later tests showed no issues, and that, on January 29, 2015, Rodella told him that he had no acute concerns and that he was feeling well.  See Peterson Email at 1.  Peterson opines that Rodella is not in such poor health as to require significant medial attention and that Rodella's health has improved since incarceration.  See Peterson Email at 1-2.

The second electronic mail transmission summarizes information that Albert Lovato, a unit manager at Torrance County Detention, provided to Varley.  See Electronic Mail Transmission from Mitch Varley to John W. Howard (Feb. 12, 2015), filed February 23, 2015 (Doc. 209-2)("Varley Email").  Varley states that one inmate has threatened Rodella, but that the inmate has had restrictions placed on him, so that there has not been an issue for several weeks. See Varley Email at 1.  He notes that Rodella stated that he has received other threats, but that Rodella was unable to identify the specific inmate who made the threats, that Rodella has not filed an official report about any threat, and that Rodella told Lovato that he is doing ok.  See Varley Email at 1.  Varley states that Rodella is currently segregated from the other inmates, because of his previous employment.  See Varley Email at 1.  Varley notes a number of safety measures that have been placed on Rodella and notes that other inmates can antagonize Rodella by yelling through their door, recreation cage, or shower.  See Varley Email at 1.

Rodella replied on March 4, 2015.  See Reply in Support of Motion for Release Pending Appeal, filed March 4, 2015 (Doc. 211)("Reply").  He asserts that the United States does not dispute the flight risk, danger, or delay prongs for release pending appeal.  Reply at 1.  He also asserts that, while an abuse-of-discretion standard is deferential, it is not an insuperable barrier, because the improper admission of 404(b) evidence leads to reversals all the time.  See Reply

at 1-2.   Rodella contends that, if the admission of 404(b) evidence is a frequent ground for reversal, it can serve as a substantial question.   See Reply at 2.   He argues that, while there may be some close cases, this case is not one of them, because the permissible uses for the evidence were never in dispute or they required a propensity-based inference.   See Reply at 2.   Rodella maintains that a propensity-based inference is impermissible.   See Reply at 3.   He states that the cases which the United States cites stand only for the proposition that evidence introduced for a proper purpose may also show propensity and that a district court must carefully balance the evidence under rule 403.   See Reply at 3-4.

Rodella asserts that the United States misused the 404(b) evidence in closing and that, even if the United States obtained admission of the evidence for a non-propensity purpose, it must limit its use of the evidence to the proffered purpose.   See Reply at 4-5.   He contends that the United States did not make an effort to limit its closing argument, which defied the Court's order and exploited the 404(b) evidence for an unlawful purpose.   See Reply at 5.   Rodella argues that courts regularly focus on the United States' use of other-act evidence during closing in reversing convictions.   See Reply at 5.   In response to the United States' argument that he waived the issue by not objecting, Rodella contends that he objected to the United States' closing, and that he asked the Court to instruct the jury and moved for a mistrial.   See Reply at 5. He maintains that he was not required to do anything more to preserve the closing-argument error.   See Reply at 5.   Rodella also contends that the United States' closing argument was not harmless error.   See Reply at 6.

Rodella argues that, if the other-act-evidence issue is decided in his favor, it will likely result in a new trial.   See Reply at 6.   He maintains that other-act evidence is very persuasive to juries, to the point that courts have found the evidence prejudicial even if the United States never

mentioned it in closing.  See Reply at 6.  Rodella contends that the United States did everything

it could "to ratchet up the prejudicial impact of the Maes, Ledesma, and Gonzales incidents."

Reply at 6.  He argues that, after fighting to introduce the evidence and improperly emphasizing

it, the United States cannot now argue that the evidence would not have made a difference at

trial.  See Reply at 6.

Rodella maintains that he has identified five exceptional reasons that justify release

pending appeal.  See Reply at 7.  He argues that the United States' weak defense of the way it

used the other-act evidence strongly increases the chances that the Tenth Circuit will reverse his

conviction, which weighs in favor of releasing him while the appeal proceeds.  See Reply at 7.

Rodella contends that this justification constitutes an exceptional circumstance, because

detaining him pending appeal might be unreasonable when the imprisonment could be

determined to be unjustified.  See Reply at 7.  Rodella responds to the United States' assertion

that his health has improved since incarceration by arguing that the Presentence Report,

disclosed December 3, 2014, revised January 15, 2015 ("PSR"), states that he suffers from

hemochromatosis, which requires doctors to remove blood from his body on a regular basis to

reduce iron levels.  Reply at 7-8.  Rodella states that, while he believes that the BOP can handle

his health, he is concerned about the Torrance County Detention's ability, because a nurse at

Torrance County Detention, not a doctor, is caring for him.  See Reply at 8.

Rodella asserts that the United States misses the point on his argument concerning the

nature of the violent act.  See Reply at 8.  Rodella contends that Congress requires violent

offenders to be incarcerated pending appeal, absent exceptional circumstances, because violent

offenders present a high likelihood of endangering the community.  See Reply at 8.  He argues

that other courts' examples of exceptional circumstances -- such as a mercy killing -- are not

exhaustive and that, here, Rodella presents a low risk of future violence, because he is no longer a law enforcement officer.  See Reply at 8.  Rodella argues that his status as a former law enforcement officer is an exceptional circumstance, because, while he may be safer in a BOP facility, at Torrance County Detention, he is incarcerated with violent offenders.  See Reply at 8-9.  He notes that he is currently being kept in solitary confinement for his own protection, but solitary confinement has debilitating psychological effects and that, during his one hour a day in which he is not in solitary, a violent inmate has threatened him twice.  See Reply at 9 & n.7.  Rodella contends that, if his conviction had already been affirmed, the risks that he faces as a former law enforcement officer would be inevitable and that subjecting him to such risks now, when there is a substantial chance that his conviction will be overturned, is unreasonably harsh.  See Reply at 9.  Concerning his family circumstances, Rodella concedes that, by itself, his family situation would likely not be grounds for release, but that, in combination with his other reasons, it is unreasonable to incarcerate him pending his appeal.  See Reply at 9.

> ### 3.    The March 10, 2015, Hearing.

The Court held a hearing on March 10, 2015.  See Transcript of Hearing (taken March 10, 2015), filed March 19, 2015 (Doc. 213)("Tr.").  Rodella asserted that, because the United States has not disputed the elements of flight risk, danger to the community, or delay, the only real issues are whether there is a substantial question and exceptional circumstances.  See Tr. at 3:10-15 (Cline).  For the 404(b) evidence, Rodella stated that the Court should use an abuse-of-discretion standard, which is deferential, and that the misuse of 404(b) evidence is a common ground for reversal, because of the prejudicial effect that it creates.  See Tr. at 3:16-4:7 (Cline). He argued that there is a difference between cases in which 404(b) evidence has some collateral propensity effect and where an impermissible propensity inference must be made for the

evidence to be relevant.  See Tr. at 4:13-5:5 (Cline).  He asserted that, here, the only way the 404(b) evidence is relevant to intent is if it shows propensity, specifically that he had a propensity for road rage, for arrogance, for bullying, and for having an enormous ego.  See Tr. at 5:6-16 (Cline).  He asserted that, in the 404(b) MOO, the Court wrestled with the fuzzy link between the prior acts, the intent, and the propensity danger, and that the evidence required the impermissible inference of "[o]nce a jerk, always a jerk."  Tr. at 5:17-6:6 (Cline).

Rodella argued that the United States used the evidence in closing to highlight its propensity effect, and that the United States discussed it at the beginning of its closing and at the end of its rebuttal when the jury was paying the most attention.  See Tr. at 6:15-7:1 (Cline).  He asserted that, at the beginning of its closing argument, the United States discussed the Maes incident to argue that Rodella has a propensity of being arrogant, being a bully, and being a jerk.  See Tr. at 7:2-24 (Cline).  Rodella again summarized the United States' closing, his objection, the Court's direction to the United States to tell the jury the permissible purposes, and the United States' rebuttal.  See Tr. at 7:25-8:11 (Cline, Court).  He argued that, on rebuttal, the United States made blatant propensity arguments about Rodella's ego, abuse of power, and his character.  See Tr. at 9:12-10:2 (Cline).

The Court asked Rodella about his decision to not object during the United States' rebuttal, and Rodella stated that he believes that his prior objections during closing were sufficient to alert the Court to the issue.  See Tr. at 10:8-24 (Cline, Court).  He argued that, even if the Court were to review the rebuttal for plain error, it was so patently improper that it was plain error and that the rebuttal shows the harm which the evidence caused as it came untethered from its permissible purposes.  See Tr. at 11:7-12 (Cline).  The Court asked Rodella to give its best argument for what the United States could have said in closing, assuming the 404(b) MOO

is correct.  See Tr. at 11:25-12:21 (Cline, Court).  Rodella stated that the United States could not have said much more than the 404(b) MOO's script, because anything more would merge into propensity and would be impermissibly prejudicial.  See Tr. at 12:22-13:13 (Cline).  He argued that the only permissible purpose for which the other-act evidence could be used was intent, and that, assuming the 404(b) MOO was correct, the United States should have read the Court's script and then told the jury that, if it had any doubts to Rodella's intent to violate Tafoya's constitutional rights, the other acts should dispel those acts.  See Tr. at 13: 10-24 (Cline).  He maintained that the United States' use of the evidence was completely untethered from the script and that it completely disregarded he Court's limitations that it placed on the evidence.  See Tr. at 13:25-14:11 (Cline).  Rodella noted that it is understandable for a lawyer to want to use strong evidence in closing in the most persuasive manner, but that does not excuse the United States' use of the evidence.  See 14:12-15:4 (Cline).

The Court asked Rodella to give his best argument that the United States' opening during closing argument was incorrect, and Rodella stated that, during the beginning of its closing argument, the United States made a propensity argument that disregarded the 404(b) MOO.  See Tr. at 15:5-9 (Cline, Court).  Rodella argued that, by requesting an instruction during the United States' closing, he preserved the error and that the United States' statements at the beginning of the closing were like drops of poison that, short of a mistrial, could not be remedied.  See Tr. at 16:20-17:2 (Cline, Court).  Rodella noted that the United States had a high burden to meet to prove specific intent, but argued that, based on the way the evidence played out at trial, the other acts were unnecessary, because, if the jury believed Tafoya, there was sufficient evidence to show intent.  See Tr. at 17:3-18:19:6 (Cline, Court).  The Court asked Rodella how the Court was supposed to know pretrial how the evidence would play out at trial and in what areas the

parties would strategically chose to litigate, and Rodella replied by stating that, while he appreciates the difficulties the Court faces, those difficulties should counsel greater caution in this area.  See Tr. at 19:7-22 (Cline, Court).  Concerning harmless error, Rodella mainly relied on his brief, but reiterated that the United States used this emotional evidence at the end of its case-in-chief to highlight it and added that Gonzales choked up while testifying, which increased the evidence's emotional impact.  See Tr. at 20:23-21:10 (Cline).

Rodella argued that the strength of his appeal is an exceptional circumstance and that all of his other exceptional reasons should be viewed through his appeal's strength, because, if he should not have been incarcerated at all, any incarceration is unreasonable.  See Tr. at 38:20-39:24 (Cline).  Rodella stated that, while he is not at death's door, his health creates an exceptional circumstance, because a nurse at Torrance County Detention, and not a doctor, is treating him.  See Tr. at 40:1-14 (Cline).  The Court asked Rodella why he was still at Torrance County Detention, rather than a BOP facility, and Rodella replied that he did not know, but that he would rather be in a BOP facility for health and safety reasons.  See Tr. at 40:16-42:6 (Cline).  The Court asked if Rodella's health had deteriorated since incarceration, and he responded by stating that he is in solitary confinement for safety reasons and that solitary confinement is taking a psychological toll on him.  See 42:7-43:15 (Cline, Court).  He asserted that, if transferred to a BOP facility, he would not be placed in isolated confinement, because of the safety measures in place.  See 44:8-21 (Cline).  Rodella argued that, even though Torrance County Detention is doing its best to keep him safe, it cannot fully isolate him from other prisoners, which creates a risk.  See Tr. at 43:16-44:7 (Cline).  Addressing the act's violent nature, Rodella contended that someone who commits a violent offense is at a heightened risk of committing another violent

offense and that he is unlikely to commit another violence crime, because he is no longer a law enforcement officer.  See Tr. at 44:24-46:4 (Cline).

The Court noted that both sides rely on United States v. Garcia, which is a case from the United States Court of Appeals for the Ninth Circuit, to establish the standards for exceptional circumstances and asked Rodella how he reconciles a non-binding appellate court case with Congress' clear intent that violent offenders be not be released pending appeal.  See Tr. at 46:7-47:2 (Court).  Rodella responded by noting that the Tenth Circuit has cited to United States v. Garcia in an unpublished opinion and that the Ninth Circuit's standard is widely accepted.  See Tr. at 47:3-8 (Cline, Court).  He argued that, while Congress intended for violent offenders to be incarcerated pending appeal except in exceptional circumstances, this case presents exceptional circumstances.  See Tr. at 47:9-48:11 (Cline).

The United States asserted that willfulness is a high standard and that none of the cases to which Rodella cites concern willfulness.  See Tr. at 20:17-25 (Neda).  The United States argued that the prior incidents in this case were not nearly as inflammatory as the other-act evidence in other cases, such as drug trafficking, sexual assaults, or killings.  See Tr. at 21:1-10 (Neda).  It contended that, to prove willfulness, it had to explain Rodella's behavior and his mindset, which is for what it used the evidence, and not to show that Rodella had bad character.  See Tr. 21:11-22:2 (Neda).  The United States argued that it was entitled to use the 404(b) evidence to show that Rodella had a motive or intent to punish those who disrespect him, and that, on rebuttal, it merely recited Maes', Ledesma's, and Gonzales' testimony and then mentioned Rodella's ego to state that he intended to punish those who disrespected him.  See Tr. at 22:3-19 (Neda).  The United States stated that, at trial, it did not argue that Rodella was a criminal because he committed other crimes, or that he was a jerk because he acted like a jerk in the past.

See Tr. at 22:20-25 (Neda).   The United States asserted that, during his opening, Rodella contended that he did not act with an intent to violate Tafoya's constitutional rights and that, before the trial began, Rodella attempted to try the case in front of the media.  See Tr. at 23:11-24:3 (Neda).  It contended that, even though Rodella offered a different version of events at trial than the United States, the reason for the different version was to show a lack of criminal intent, which demonstrated that it was an issue throughout the trial.  See Tr. at 24:6-21 (Neda).

The United States argued that it also had to show that Rodella arrested Tafoya without probable cause and that, during rebuttal, it mentioned Maes', Ledesma's, and Gonzales' fear to show that a person is afraid when they are stopped by someone whom they do not know is a law enforcement officer or who acts in a threatening manner.  See Tr. at 24:22-26:3 (Neda).   It contended that it discussed fear to counter Rodella's version of events that Tafoya was fleeing to avoid being cited for having an expired license rather than fleeing because of a fear for his life. See Tr. at 26:3-9 (Neda).  The United States maintained that it discussed Rodella's ego to show Rodella's bad purpose that he knew he was doing wrong but chose to do it anyway.  See Tr. at 26:15-25 (Neda).

The United States maintained that the 404(b) evidence was, at most, harmless error.  See Tr. at 27:6-11 (Neda).   It contended that the case came down to whether the jury believed Tafoya's version of events and that, in the end, the 404(b) evidence was not important and that it became even less important as the case developed through trial.  See Tr. at 27:12-23 (Neda).  The United States argued that Rodella approved the Court's limiting instruction that was in the jury instructions and that he objected only to the introduction of the evidence.  See Tr. at 29:2-15 (Neda).  The United States contended that Rodella's approval of the jury instruction shows that it was permitted to highlight Rodella's motive to satisfy his ego.  See Tr. at 29:23-30:1 (Neda).

The Court asked the United States if it would have been prepared to go to trial if the Court excluded the other-act evidence, and the United States stated that it was prepared to argue the case in the exact same manner before it learned about the other-act evidence. <u>See</u> Tr. at 30:2-19 (Neda, Court). The Court asked if the United States would have appealed the Court's decision if it had excluded the evidence, and the United States replied by stating that, before trial, it saw the evidence as important, because of its high burden to prove willfulness, but that, as the trial progressed, it believed that there was a high probability of conviction even without the 404(b) evidence. <u>See</u> Tr. at 30:20-31:7 (Neda).

The Court asked the United States if it believed that any of its comments in closing argument were untethered from a proper purpose, and the United States argued that it did not. <u>See</u> Tr. at 31:8-17 (Neda, Court). It asserted that its opening remarks concerning the Maes incident went to Rodella's ego, which showed his bad purpose or willfulness. <u>See</u> Tr. at 31:16-24 (Neda). The United States noted that it misunderstood the Court's direction in the 404(b) MOO, believing that, before it recited Maes', Ledesma's, and Gonzales' testimony, it needed to read the proper purpose for the evidence and that it intended to read the Court's script at the beginning of its rebuttal. <u>See</u> Tr. at 31:25-32:9 (Neda). The United States contended that its comment about Gonzales in the first part of its closing did not prejudice Rodella, because it only mentioned that it would discuss Gonzales later while it was discussing Rodella's training materials, and because it was not comparing Gonzales to Rodella. <u>See</u> Tr. at 32:10-23 (Neda). The United States argued that, when it mentioned the prior incidents the third time before its rebuttal, it used them to discuss the fear that Tafoya felt and to discuss Rodella's ego to show his mindset. <u>See</u> Tr. at 32:24-33:8 (Neda). The Court asked the United States how confident it was

that it would prevail on appeal, and it stated that it was very confident that it would prevail on the admission of the 404(b) evidence.  See Tr. at 33:12-21 (Neda).

The United States addressed Rodella's contention that 404(b) evidence is the most common grounds for reversal by arguing that, since 1988, the Tenth Circuit reversed only four cases out of one hundred and ten on the basis of admitting improper 404(b) evidence and that those four cases are easily distinguishable.  See Tr. at 34:22-35:15 (Neda).  It contended that it is confident that it will win on appeal by stating that the Court's jury instructions were very detailed and that Rodella approved the instructions.  See 34:16-25 (Neda).  Addressing Rodella's propensity arguments, the United States argued that most of its closing argument focused on Rodella's ego, that its reference to Gonzales was in connection to Rodella's training materials, and that it discussed fear at the end of its closing to show that Tafoya was not fleeing Rodella because he was a criminal.  See Tr. at 35:3-15 (Neda).  The United States addressed Rodella's sexual assault analogy -- i.e. that introducing the prior-act evidence here would be like introducing evidence of prior sexual assaults in a sex abuse case to show that the defendant cannot control his sexual interests -- by arguing that the Tenth Circuit considered a similar situation in United States v. Johnson, where the Tenth Circuit permitted evidence of prior sexual assaults to be admitted.  See Tr. at 49:4-13 (Neda).  The United States argued that Rodella relies on cases from the United States Court of Appeals for the Seventh Circuit, which appears to have a different standard for 404(b) evidence.  See Tr. at 49:13-18 (Neda).  In response to Rodella's argument that he did not address the 404(b) evidence in closing, the United States argued that Rodella requested an instruction on the evidence before his closing.  See Tr. at 50:4-18 (Neda).

The United States noted that it does not contend that Rodella poses a flight risk, is a danger to the community, or is appealing for delay.  See Tr. at 48:21-49:3 (Neda, Court).  The

United States contended that the Court need only address the exceptional circumstances prong, and not the substantial question issue, to deny the Motion.  See Tr. at 50:19-52:1 (Neda). Addressing Rodella's health, the United States noted that a nurse practitioner, and not just a nurse, is caring for him, and that a nurse practitioner is able to make diagnoses, prescribe drugs, and act as a primary health practitioner.  See Tr. at 52:2-21 (Neda).  The United States contended that Rodella's health has improved since being incarcerated.  See Tr. at 52:22-53:21 (Neda, Court).  The United States asserted that Rodella will be designated to be transferred to a BOP facility within a week, so Rodella's concerns about solitary confinement will be alleviated.  See Tr. at 53:22-54:9 (Neda).  The United States argued that Rodella's status as a law enforcement officer should not affect the Court's decision, because it would lead to a rule that law enforcement officers should not be incarcerated.  See Tr. at 54:10-19 (Neda).  The United States noted that, while the district judge departed downward in United States v. Koon because of the defendants' status as law enforcement officers, it did not release the defendant pending appeal, when the defendant's offense -- beating Rodney King -- had led to national outrage and riots. See Tr. at 54:16-55:22 (Neda, Court).  Concerning Rodella's family situation, the United States contended that his children are in their mid-twenties and that Rodella has a lot of siblings to assist his family.  See Tr. at 55:24-56:5 (Neda).

Rodella responded to the United States' argument that it could use the 404(b) evidence to show Rodella's motive and intent by arguing that it was a propensity-based use and analogizing it to introducing evidence of prior sexual assaults in a sex-abuse case to show that the defendant cannot control his sexual interests.  See Tr. at 36:6-24 (Cline).  He argued that the United States used the evidence to show that Rodella had a large ego and was susceptible to road rage, and that, in prior occasions and on this occasion, he acted in conformance with that character trait.

See Tr. at 36:25-37:8 (Cline).   Concerning harmless error, Rodella stated that it is remarkable that the United States would fight hard to introduce evidence at trial, present it in detail at trial, argue it in closing and on rebuttal, and then, on appeal, say that it was harmless and made no difference.   See Tr. at 37:12-19 (Cline).   He contended that, on appeal, if the admission of the 404(b) evidence or the United States' closing is found to be error, it will not be harmless error. See Tr. at 37:20-38:1 (Cline).   Rodella argued that he did not discuss the other incidents in closing, because it was poisonous evidence to which he did not want to draw attention.   See Tr. at 38:2-19 (Cline).

Rodella asserted that United States v. Johnson may have been a situation where 404(b) evidence was properly admitted, because the defendant argued that he accidently pressed up against flight attendants, and because evidence of other similar incidents showed that his actions were not accidental.   See Tr. at 56:11-5 (Cline).   Rodella contended that his case does not have a tight fit between the charged offense and the other-act evidence.   See Tr. at 57:4-5 (Cline). Rodella responded to the United States' argument that he acquiesced to the Court's jury instructions by arguing that he did so only because of the Court's ruling in the 404(b) MOO.   See Tr. at 57:6-16 (Cline).   Rodella asserted that he does not doubt that someone told the United States that he would be designated to be transferred to a BOP facility, but argued that sometimes months pass between designation and transport.   See Tr. at 57:17-23 (Cline).   Rodella stated that, if the Court would not release him pending his appeal, the Court should release him until he is designated to be transferred to a BOP facility and allow him to self-surrender there.   See Tr. at 58:4-14 (Cline).

The Court told the parties that it would probably deny the Motion on the basis of exceptional circumstances, but also that it would likely address the substantial question prong as well. See Tr. at 63:5-65:1 (Court).

## LAW REGARDING RELEASE PENDING APPEAL

18 U.S.C. § 3143(a) provides:

**(b)    Release or detention pending appeal by the defendant. --**

> **(1)    Except** as provided in paragraph (2), the judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, unless the judicial officer finds --
>
> > **(A)    by** clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and
> >
> > **(B)    that** the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in--
> >
> > > **(i)     reversal,**
> > >
> > > **(ii)    an** order for a new trial,
> > >
> > > **(iii)   a** sentence that does not include a term of imprisonment, or
> > >
> > > **(iv)    a** reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

If the judicial officer makes such findings, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c) of this title, except that in the circumstance described in subparagraph (B)(iv) of this paragraph, the judicial

officer shall order the detention terminated at the expiration of the likely reduced sentence.

(2)     The judicial officer shall order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of section 3142 and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained.

18 U.S.C. § 3143(b).  Offenses falling under 18 U.S.C. § 3142(f)(1)(A) include a "crime of violence."  18 U.S.C. § 3142(f)(1)(A).  "'A substantial question is one of more substance than would be necessary to a finding that it was not frivolous.  It is a close question or one that very well could be decided the other way. . . .  Whether a particular question is substantial must be determined on a case-by-case basis.'"  United States v. Farr, 457 F. App'x at 758 (alterations omitted)(quoting United States v. Affleck, 765 F.2d at 952).

Section 3145(c) provides:

(c)     **Appeal from a release or detention order.** -- An appeal from a release or detention order, or from a decision denying revocation or amendment of such an order, is governed by the provisions of section 1291 of title 28 and section 3731 of this title. The appeal shall be determined promptly. A person subject to detention pursuant to section 3143(a)(2) or (b)(2), and who meets the conditions of release set forth in section 3143(a)(1) or (b)(1), may be ordered released, under appropriate conditions, by the judicial officer, if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate.

18 U.S.C. § 3145(c).  Section 3145(c) refers expressly only to appeals from a release or detention order.  See 18 U.S.C. § 3145(c).  The Tenth Circuit has, however, decided that a district court may apply this subsection even when there is no appeal of a detention order.  See United States v. Jones, 979 F.2d 804, 806 (10th Cir. 1992)(per curiam)(citing United States v. Herrera-Soto, 961 F.2d 645, 647 (7th Cir. 1992)(per curiam); United States v. DiSomma, 951 F.2d 494, 496 (2d Cir. 1991); United States v. Carr, 947 F.2d 1239, 1240 (5th Cir. 1991)(per curiam))("All the

other circuits that have addressed the issue have ruled that the 'exceptional reasons' provision does apply to district courts.  We now join those circuits and hold that a district court may consider whether exceptional reasons exist to release a defendant under 18 U.S.C. § 3145(c)." (citations omitted)).  Once a jury has found a defendant guilty of an offense that triggers the provisions of § 3143(a)(2), a court may, under § 3145(c), order a defendant's release if a court finds that the defendant is not a danger or a flight risk, and there exists exceptional reasons to justify release.  See 18 U.S.C. § 3145(c); United States v. Peterson, 185 F.3d 875, 1999 WL 407493, at *1 (10th Cir. 1999)(table decision)(unpublished)[4]; United States v. Kinslow, 105 F.3d 555, 556-57 (10th Cir. 1997)(stating that a defendant who sought release pending sentencing for a crime of violence must show by clear-and-convincing evidence that he was "not likely to flee or pose a danger to any other person or the community," and by "making a clear showing of exceptional reasons why his detention would not be appropriate"); United States v. Jager,

_____

[4]United States v. Peterson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that United States v. Peterson, United States v. Shaw, 562 F. App'x 593 (10th Cir. 2014)(unpublished), United States v. Begay, 550 F. App'x 604 (10th Cir. 2013)(unpublished), United States v. Farr, 457 F. App'x 757 (10th Cir. 2012)(unpublished), United States v. Vaughan, 450 F. App'x 757 (10th Cir. 2011)(unpublished), United States v. Rich, 348 F. App'x 352 (10th Cir. 2009)(unpublished), United States v. Wages, 271 F. App'x 726 (10th Cir. 2008)(per curiam) (unpublished), United States v. LaFlora, 146 F. App'x 973 (10th Cir. 2005)(unpublished), and United States v. Aldape, 28 F.3d 113 (10th Cir. 1994)(table opinion)(unpublished), have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

No. 10-1531, 2011 WL 831279, at *18 (D.N.M. Feb. 17, 2011)(Browning, J.)("Once a court finds that a defendant meets the criteria of § 3143(a)(2), a court may order a defendant's release if a court finds that the defendant is not a danger and there exists exceptional circumstances to justify release.").

Moreover, even if applicable to release following a guilty verdict and before appeal, a plain reading of § 3145(c) would be that a defendant covered by § 3143(b) has to satisfy an additional requirement to take advantage of § 3145(c) -- that there are exceptional reasons that make the person's detention inappropriate.  See 18 U.S.C. § 3145(c); United States v. Jones, 979 F.2d at 805.  The Tenth Circuit fleshed out how § 3145(c) operates:

> Appellants pled guilty to certain drug offenses that carried maximum penalties of forty years.  Therefore, appellants were subject to the mandatory detention provisions of the Bail Reform Act.  Pursuant to 18 U.S.C. § 3143(a)(2), to secure their release pending sentencing, appellants had to establish by clear and convincing evidence that they were not likely to flee or pose a threat to the community if released, and either the government had to recommend that no sentence of imprisonment be imposed or the district court had to find that a motion for new trial or acquittal was likely to be granted.  The district court found that neither appellant was likely to flee or pose a danger to the community if released, but that neither could meet the other requirements of § 3143(a)(2).
>
> Appellants argued that even if they did not meet the requirements of § 3143(a)(2), they were entitled to release pending sentencing if they made the appropriate showing of exceptional circumstances under § 3145(c).   Section 3145(c), entitled "[a]ppeal from a release or detention order," provides that an appeal from a release or detention order shall be governed by 28 U.S.C. § 1291 and 18 U.S.C. § 3731 and shall be determined promptly.  In 1990, the section was amended to provide further:
>
>> A person subject to detention pursuant to section 3143(a)(2) or (b)(2), who meets the conditions of release set forth in section 3143(a)(1) or (b)(1), may be ordered released, under appropriate conditions, by the judicial officer, if it is clearly shown there are exceptional reasons why such person's detention would not be appropriate.
>
> Because this "exceptional reasons" provision was added to the provision concerning appeals from detention orders, some district courts, like the one here,

- 47 -

have questioned whether they have the authority to consider exceptional reasons for release in the first instance.

 In ruling on appellants' request for release, the district court expressed its belief that § 3145(c) applied to the courts of appeals and not to the district courts. Nonetheless, in the event appellants' interpretation of the law proved correct, the district court considered the circumstances cited by appellants as exceptional reasons warranting their release. The court determined that none of the circumstances cited constituted an exceptional reason for release.

United States v. Jones, 979 F.2d at 805 (citations omitted). 18 U.S.C. §§ 3143 and 3145 do not define the phrase exceptional reasons. See 18 U.S.C. §§ 3143, 3145. Accord United States v. Jager, 2011 WL 831279, at *18 ("Section 3143 does not define 'exceptional reasons.'"). The Tenth Circuit has stated that exceptional reasons means "being out of the ordinary: uncommon, rare." United States v. Wages, 271 F. App'x 726, 727 (10th Cir. 2008)(per curiam) (unpublished). Accord United States v. DiSomma, 951 F.2d at 497 (stating that exceptional circumstances are "a unique combination of circumstances giving rise to situations that are out of the ordinary," and finding that a defendant's status as a student, as employed, or as a first-time offender did not constitute exceptional circumstances). "A wide range of factors may bear upon the analysis" to determine whether exceptional circumstances exist. United States v. Garcia, 340 F.3d 1013, 1018 (9th Cir. 2003).

## LAW REGARDING RULE 404(b)

 Under rule 404(b), evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person to show action in conformity therewith. See Fed. R. Evid. 404(b). Rule 404(b) provides:

 **(b)** **Crimes, Wrongs, or Other Acts.**

  **(1)** **Prohibited Uses.** Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

- 48 -

> **(2)    Permitted Uses; Notice in a Criminal Case.**   This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.  On request by a defendant in a criminal case, the prosecutor must:
>
>> **(A)**    provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and
>>
>> **(B)**    do so before trial -- or during trial if the court, for good cause, excuses lack of pretrial notice.

Fed. R. Evid. 404(b).  "In other words, one cannot present evidence the relevance of which is based on the forbidden inference: the person did X in the past, therefore he probably has a propensity for doing X, and therefore he probably did X this time, too."  Wilson v. Jara, No. 10-0797 JB/WPL, 2011 WL 6739166, at *5 (D.N.M. Nov. 1, 2011)(Browning, J.).  "The rule, however, has a number of 'exceptions' -- purposes for which such evidence will be admissible."  Wilson v. Jara, 2011 WL 6739166, at *5.  Those purposes include proving motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.  See Fed. R. Evid. 404(b).  The Supreme Court of the United States has enunciated a four-part process to determine whether evidence is admissible under rule 404(b).  See Huddleston, 485 U.S. at 691-92.  The Tenth Circuit has consistently applied that test:

> To determine whether Rule 404(b) evidence was properly admitted we look to [a] four-part test . . . : (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) pursuant to Fed. R. Evid. 105, the trial court shall, upon request, instruct the jury that evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

United States v. Zamora, 222 F.3d 756, 762 (10th Cir. 2000)(citing United States v. Roberts, 185 F.3d 1125 (10th Cir. 1999)).   See United States v. Higgins, 282 F.3d 1261, 1274 (10th Cir. 2002); United States v. Hardwell, 80 F.3d 1471, 1488 (10th Cir. 1996)(citing Huddleston, 485 U.S. at 691-92).

Rule 404(b)'s prohibition finds its source in the common-law protection of the criminal defendant from risking conviction on the basis of evidence of his character.   See Wynne v. Renico, 357 F.3d 599, 611 (6th Cir. 2004)(citing United States v. Dudek, 560 F.2d 1288 (6th Cir. 1977)); 22 C. Wright & K Graham, Federal Practice and Procedure: Evidence § 5239, at 428, 436-37, 439 (1991).  In United States v. Phillips, 599 F.2d 134 (6th Cir. 1979), the United States Court of Appeals for the Sixth Circuit noted, in addressing rule 404(b)'s limitations and requirements, that the rule addresses two main policy concerns: (i) that the jury may convict a "bad man" who deserves to be punished, not because he is guilty of the crime charged, but because of his prior or subsequent misdeeds; and (ii) that the jury will infer that, because the accused committed other crimes, he probably committed the crime charged.   United States v. Phillips, 599 F.2d at 136.   "'[W]hen other-act evidence is admitted for a proper purpose and is relevant, it may be admissible even though it has 'the potential impermissible side effect of allowing the jury to infer criminal propensity.'"   United States v. Moran, 503 F.3d 1135, 1145 (10th Cir. 2007)(quoting United States v. Cherry, 433 F.3d 698, 701 n.3 (10th Cir. 2005)).  See United States v. Romero, No. CR 09-1253 JB, 2011 WL 1103862, at *12 (D.N.M. March 9, 2011)(Browning, J.)("Rule 404(b) evidence almost always has some propensity evidence.").

When bad act evidence is both relevant and admissible for a proper purpose, "the proponent must clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the bad act."

United States v. Morley, 199 F.3d 129, 133 (3d Cir. 1999)(alterations omitted).  The Tenth

Circuit has also stated that district courts must "identify specifically the permissible purpose for

which such evidence is offered and the inferences to be drawn therefrom."  United States v.

Youts, 229 F.3d 1312, 1317 (10th Cir. 2000)(citing United States v. Kendall, 766 F.2d 1426,

1436 (10th Cir. 1985)).

> The Government must articulate precisely the evidentiary hypothesis by which a
> fact of consequence may be inferred from the evidence of other acts.  In addition,
> the trial court must specifically identify the purpose for which such evidence is
> offered and a broad statement merely invoking or stating Rule 404(b) will not
> suffice.

United States v. Romine, 377 F. Supp. 2d 1129, 1132 (D.N.M. 2005)(Browning, J.)(quoting

United States v. Kendall, 766 F.2d at 1436).  Rules 401-403 and the conditional relevancy rules

in rule 104(b) govern the applicable burden the proponent must meet to successfully offer

evidence under rule 404(b).  See Huddleston v. United States, 485 U.S. at 686-691.

The Tenth Circuit has recognized the probative value of uncharged, unrelated acts to

show motive, intent, and knowledge, when the uncharged, unrelated acts are similar to the

charged crime and sufficiently close in time.  See United States v. Olivo, 80 F.3d 1466, 1468-69

(10th Cir. 1996)(finding the district court did not abuse its discretion when it admitted evidence

about an event over one year after a defendant's arrest); United States v. Bonnett, 877 F.2d 1450,

1461 (10th Cir. 1989)(holding that evidence about events over a year after the charged conduct

was not "too remote in time and unrelated to the transactions with which he was charged").  This

similarity may be shown through "physical similarity of the acts or through the 'defendant's

indulging himself in the same state of mind in the perpetration of both the extrinsic offense and

charged offenses.'"  United States v. Queen, 132 F.3d 991, 996 (4th Cir. 1997)(quoting United

States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978)).  See United States v. Bonnett, 877 F.2d

at 1461 ("The closeness in time and the similarity in conduct [are] matters left to the trial court, and [its] decision will not be reversed absent a showing of abuse of discretion.").  The more similar the act or state of mind, the more relevant the evidence becomes.  See <u>United States v. Queen</u>, 132 F.3d at 996.  Moreover, when establishing probative value, although the uncharged crime must be similar to the charged offense if it is unrelated to the charged offense, it need not be identical.  See <u>United States v. Gutierrez</u>, 696 F.2d 753, 755 (10th Cir. 1982).

In <u>United States v. Tan</u>, 254 F.3d 1204 (10th Cir. 2001), the Honorable LeRoy C. Hansen, United States District Judge for the District of New Mexico, excluded, in a second-degree murder case, evidence that the defendant had previously been convicted of driving while intoxicated.  See 254 F.3d at 1206-07.  The murder charge rose out of the defendant driving a vehicle while intoxicated and striking a motorcyclist with his vehicle.  See 245 F.3d at 1206.  Judge Hansen concluded that the other convictions would show only that the defendant had a propensity for drunk driving and would be more prejudicial than probative.  See 254 F.3d at 1207.  The Tenth Circuit reversed.  In an opinion that the Honorable Stephen H. Anderson, United States Circuit Judge for the Tenth Circuit, wrote, and Judges Seymour and Kelly joined, the Tenth Circuit held that, because second-degree murder requires proof of malice, the prior convictions were probative to the proper purpose of proving malice or intent, by reasoning that a person who is convicted of drunk driving is more aware of the substantial risks and harm that it can cause to others.  See 254 F.3d at 1210-11.

## **LAW REGARDING RULE 403**

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting

cumulative evidence." Fed. R. Evid. 403. Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice. See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989). "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991))(internal quotation marks omitted). "In performing the 403 balancing, the court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d 1262, 1274 (10th Cir. 2000). The "[e]xclusion of otherwise admissible evidence under Rule 403 'is an extraordinary remedy and should be used sparingly.'" United States v. Smalls, 752 F.3d 1227, 1238 n. 4 (10th Cir. 2014)(quoting United States v. Tan, 254 F.3d at 1211).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980). As the Supreme Court has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(citation omitted).

Evidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response from the jury, or if the evidence otherwise tends to adversely affect the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence

of the crime charged.  See United States v. Rodriguez, 192 F.3d 946, 951 (10th Cir. 1999).

"Evidence is not unfairly prejudicial simply because it is damaging to an opponent's case."

United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008)(quoting United States v. Curtis,

344 F.3d 1057, 1067 (10th Cir. 2003)).  Rather, "[t]o be unfairly prejudicial, the evidence must

have 'an undue tendency to suggest decision on an improper basis, commonly, though not

necessarily, an emotional one.'"  United States v. Caraway, 534 F.3d at 1301 (quoting Fed. R.

Evid. 403 advisory committee notes).

## DEFINITION OF WILLFULLY UNDER 18 U.S.C. § 242

Section 242 prohibits a defendant from "willfully subject[ing]" a person "to the

deprivation of any rights, privileges, or immunities secured or protected by the Constitution or

the laws of the United States."  18 U.S.C. § 242.  The deprivation of a constitutional, or other

federal, right and the willfulness of such deprivation, are two separate elements.  See United

States v. Reese, 2 F.3d 870, 884 (9th Cir. 1993)("[T]he violation of a federally protected right

and the specific intent to violate that right are *separate* elements of the crime established by the

statute."  (emphasis in original)).

> To find the defendant guilty of this crime you must be convinced that the
> government has proved each of the following beyond a reasonable doubt:
>
> . . . .
>
> Second: the defendant deprived [name of person] of [his] [her] right to [name
> right], which is a right secured by the Constitution or laws of the United States.
>
> Third: the defendant acted willfully, that is, the defendant acted with a bad
> purpose, intending to deprive [name of person] of that right.

Tenth Circuit Pattern Jury Instructions Criminal No. 2.17, at 103-104 (2011).

The Supreme Court, in Screws v. United States, 325 U.S. 91 (1945)("Screws"),[5] defined the term "willfully" in the § 242 context.[6]   The Supreme Court explained that the term "'willful' is a word of 'many meanings, its construction often being influenced by its context.'"   Screws, 325 U.S. at 101 (quoting Spies v. United States, 317 U.S. 492, 497 (1943)).   The Supreme Court also noted that, in a criminal statute, willfully "generally means an act done with a bad purpose" and that it requires something more than merely doing "the act required by the statute."   Screws, 325 U.S. at 101.   For 18 U.S.C. § 242, the Supreme Court held that "the presence of a bad purpose or evil intent" by itself is insufficient to satisfy the "willfully" element.   Screws, 325 U.S. at 103.   To ensure that the defendants are not punished for violating an unknown constitutional or federal right, the Supreme Court construed "willfully" as requiring a defendant to either "know or act[] in reckless disregard" in depriving a person "of a defined constitutional or other federal right."   325 U.S. at 104.   As the Supreme Court stated, "[w]hen they act willfully in the sense in which we use the word, they act in open defiance or in reckless disregard of a constitutional requirement which has been made specific and definite."   325 U.S. at 105.

Accordingly, a conviction under § 242 requires proof that the defendant acted with the specific intent to deprive a person of some constitutional right.   See Screws, 325 U.S. at 105.

---

[5]The opinion in Screws was a plurality opinion.   See Screws, 325 U.S. at 91.   A majority of the Supreme Court, however, has subsequently adopted the Screws reasoning.   See Williams v. United States, 341 U.S. 97, 100 (1951); United States v. Guest, 383 U.S. 745, 753-54 (1966); United States v. Price, 383 U.S. 787, 793 (1966); Anderson v. United States, 417 U.S. 211, 223 (1974).   See also United States v. Johnstone, 107 F.3d 200, 213 n.8 (3d Cir. 1997); United States v. Reese, 2 F.3d at 896 n.16.

[6]The Supreme Court in Screws construed the predecessor statute to 18 U.S.C. § 242 -- 18 U.S.C. § 52.   Courts interpret Screws' construction of the term "willfully" in the former § 52 as applicable to § 242.   See United States v. Johnstone, 107 F.3d at 207-09; United States v. Bradley, 196 F.3d 762, 769 (7th Cir. 1999); United States v. Reese, 2 F.3d at 896; United States v. Couch, 59 F.3d 171, No. 94-3292, at *3-4 (6th Cir. June 20, 1995)(table opinion) (unpublished).

"[I]t [is] not sufficient that the defendants may have had a general bad purpose; . . . it [is] necessary that they have the actual purpose of depriving [the victim] of the constitutional rights enumerated in the indictment . . . ."  Apodaca v. United States, 188 F.2d 932, 937 (10th Cir. 1951).

## ANALYSIS

This case comes in the context of the Department of Justice declining to bring high-profile civil rights criminal prosecutions across the nation because of the difficulties of proof in the cases.  See Memorandum from Department of Justice, Department of Justice Report Regarding the Criminal Investigation into the Shooting Death of Michael Brown by Ferguson, Missouri Police Officer Darren Wilson at 86 (March 4, 2015)(declining to bring charges against Ferguson, Missouri, police officer Darren Wilson for shooting of Michael Brown; stating that, because, among other things, "Wilson did not act with the requisite criminal intent, it cannot be proven beyond reasonable doubt to a jury that he violated 18 U.S.C. § 242 when he fired his weapon at Brown").  In that context, this case, which the United States brought, is a reminder of the burden that the United States undertakes when it brings these criminal civil rights cases.  The United States must prove beyond a reasonable doubt that the defendant acted "in open defiance or in reckless disregard of a constitutional requirement which has been made specific and definite."  Screws, 325 U.S. at 105.  In cases involving police officers, the officer's prior similar misconduct may be highly relevant to meeting that high burden of proving specific intent.  The United States' burden is a hard one to meet; if it cannot use evidence of prior incidents to meet this burden, it may go from difficult to impossible.[7]

---

[7]While the Court is cognizant of the United States' significant burden in bringing these criminal civil rights cases, the Court has not and, of course, cannot lower the evidentiary standards of rules 403 or 404(b) to assist the United States in meeting its burden.

The Court will deny the Motion.  Rodella has not presented a substantial question that, if answered in his favor, would likely result in a new trial.  Additionally, Rodella has failed to show that he has exceptional reasons that would warrant his release pending appeal.

## I.     RODELLA HAS NOT PRESENTED A SUBSTANTIAL QUESTION THAT WILL LIKELY RESULT IN A NEW TRIAL.

Rodella has not presented a substantial question that will likely result in a new trial. Rodella argues that the admission of the other-act evidence and the United States' closing argument are substantial questions.  The Court disagrees for two reasons.  First, the admission of the other-act evidence and the Court's refusal to instruct the jury during the United States' closing argument are not close questions, as the Tenth Circuit has defined that term.  Second, even if the Court were incorrect on those two issues, it would be harmless error that would not likely result in a new trial.

### A.     THE OTHER-ACT EVIDENCE AND THE UNITED STATES' CLOSING ARGUMENT ARE NOT CLOSE QUESTIONS.

The other-act evidence and the United States' closing argument are not close questions. "'A substantial question is one of more substance than would be necessary to a finding that it was not frivolous.  It is a close question or one that very well could be decided the other way. . . . Whether a particular question is substantial must be determined on a case-by-case basis.'" United States v. Farr, 457 F. App'x at 758 (alterations omitted)(quoting United States v. Affleck, 765 F.2d at 952).

The Court believes that the Tenth Circuit will likely review Rodella's propensity argument for the admission of the 404(b) evidence under a plain-error standard, because he did not once argue, in the 404(b) Response, in the 404(b) Notice Opposition, or at the hearing on the 404(b) hearing, that the United States cannot introduce the evidence for impermissible

propensity purposes.   Instead, Rodella argued that the prejudicial effect of the evidence substantially outweighed its probative value.   The Tenth Circuit will thus review the rule 403 issue under an abuse-of-discretion standard, but the propensity issue under a plain-error standard. Concerning the United States' closing arguments, Rodella objected during and after the United States' initial closing.   Consequently, the Tenth Circuit will review that issue for abuse of discretion.   Rodella did not, however, object during or after the United States' rebuttal.   That portion of the United States' closing will likely be reviewed for plain error.

Accordingly, the purported substantial questions are as follows: (i) whether, in light of Rodella's propensity argument, the Court committed plain error by admitting the 404(b) evidence; (ii) whether the Court abused its discretion in admitting the evidence under rule 403; (iii) whether the Court abused its discretion in not instructing the jury or declaring a mistrial after the United States' initial closing argument; and (iv) whether it was plain error for the Court to not sua sponte give a limiting instruction or declare a mistrial after the United States' rebuttal. The Court concludes that these are not close questions that would likely result in a new trial. Consequently, Rodella fails to present a substantial question.

## 1.    The Admission of the 404(b) Evidence Is Not a Substantial Question.

The admission of the other-act evidence is not a close question.   Both parties state that the proper standard the Court should apply is abuse of discretion.   The Court is not certain this standard is correct.   In the 404(b) Response and the 404(b) Notice Opposition, Rodella focused almost exclusively on the lack of similarities between the charged offense and the prior incidents to argue that their prejudicial effect outweighed their probative value.   He followed a similar tactic at the hearing on the 404(b) Motion.   See 404(b) Motion Tr. at 125:1-136:7 (Gorence, Court).   In his current Motion, however, Rodella focuses on propensity.   See Motion at 5-10.

Rodella did not raise this propensity argument before filing the Motion. As such, the correct standard of review should be plain error, and not abuse of discretion. See United States v. Pablo, 696 F.3d 1280, 1298-99 (10th Cir. 2012)(stating that, because the defendant failed to raise an argument in the district court, it is reviewed for plain error); United States v. Curley, No. CR 13-0058 JAW, 2015 WL 1539619, at *9 (D. Me. Apr. 6, 2015)(Woodcock, J.)(stating that, when a defendant raises a new argument to support a motion for release pending appeal, it is reviewed for plain error); United States v. Geddings, 497 F. Supp. 2d 729, 737 (E.D.N.C. 2007)(Dever, J.) (applying plain-error standard on motion for release pending appeal when defendant failed to raise rule 404(b) argument at trial). Plain error is an exacting standard that is harder to satisfy than abuse of discretion. See Poindexter v. Atchison, Topeka & Santa Fe Ry. Co., 168 F.3d 1228, 1233 (10th Cir. 1999)("The plain error test is an exacting one."). While Rodella did not raise his propensity argument before trial, he raised a rule 403 argument, which he again raises in the Motion. See 404(b) Response at 1-4; 404(b) Notice Opposition at 1-6; Motion at 9-12. The Court will, thus, review the admission of the other-act evidence for propensity under a plain-error standard and the 403 issue under an abuse-of-discretion standard. Even though the Court believes that a plain-error standard should apply to the propensity issue, the Court will also apply an abuse-of-discretion review here, in case the Tenth Circuit decides to broadly construe Rodella's 404(b) Response and 404(b) Notice Opposition.[8]   In any case, because abuse of

---

[8]In the 404(b) Notice Opposition, Rodella argued that the 404(b) evidence was "merely a backdoor attempt to introduce character evidence to inflame the jury against Mr. Rodella." 404(b) Notice Opposition at 4. The character evidence with which Rodella was concerned may be that he is a bad or unlikeable guy, and he was concerned that the jury would convict him because he a bad guy and not because he committed the charged offense. This concern may also be that the jury would conclude that he has a propensity of acting out his road rage against other drivers who disrespect him. Rule 404(b) addresses each of these concerns. The Sixth Circuit has stated:

discretion is a more stringent standard, and because the Court concludes that it did not abuse its discretion, the Court also did not commit plain error.

The Court concludes that it correctly permitted the United States to admit the prior-act evidence and that it was not a close or substantial question that will likely result in a new trial. In requesting the Court to permit it to admit the 404(b) evidence at trial, the United States asserted that it would be used for three proper purposes: (i) to show that Rodella had "a plan to compel citizens to submit to his authority"; (ii) to show that Rodella's "motive and intent . . . were to harass and punish an innocent motorist, rather than to protect public safety or enforce traffic laws"; and (iii) to show that Rodella "did not make a mistake or accidentally forget that his identity was not apparent to all motorists when he pursued [Tafoya] in a private Jeep." Amended Motion in Limine to Introduce Evidence Pursuant to Federal Rule of Evidence 404(b) at 5, 8, filed September 10, 2014 (Doc. 56)("404(b) Motion").   Rodella argues that each of United States' proffered permissible purposes was not relevant to a disputed issue, lacks

---

Two concerns are expressed by the first sentence of Rule 404(b): (1) that the jury may convict a "bad man" who deserves to be punished not because he is guilty of the crime charged but because of his prior or subsequent misdeeds; and (2) that the jury will infer that because the accused committed other crimes, he probably committed the crime charged.

United States v. Phillips, 599 F.2d at 136.  It is unclear whether Rodella's reference to character was intended to express a concern that the jury would think he is a bad man or was intended to express a concern that the jury would think he acted in conformity with the prior incidents. Rodella seems to suggest that he was concerned about being considered a bad man, because, on the very next page of the 404(b) Notice Opposition, he argues that "the government's introduction of this evidence is solely an attempt to convince the jury that Mr. Rodella is a bad person by nature."  404(b) Notice Opposition at 5.  Moreover, in the 404(b) Response and the 404(b) Notice Opposition, and at the hearing on the motions, Rodella's argument focused on rule 403 and similarities between the prior incidents and the charged one.  The Court did not hear, to its ears, any propensity argument before trial, thought Rodella was making largely a 403 argument, and, thus, believes that the Tenth Circuit will also find that Rodella did not make a propensity argument before trial.  In case, however, the Tenth Circuit construes Rodella's objection more broadly and decides that Rodella preserved his argument, the Court will apply an abuse-of-discretion review.

evidence to support it, requires an impermissible propensity purpose, or is just another word for propensity.  See Motion at 5-8.

First, the prior incidents and the United States' purposes for those incidents were relevant to a disputed issue.  Rodella argues that the central issue at trial was whether the jury should believe Tafoya's version of events or Rodella, Jr.'s version.  See Motion at 11-12.  He contends that the United States' proffered purposes were, at most, secondary to the central issue, because he did not contest willfulness.  See Motion at 12.  First, at no point in the briefs on the 404(b) Motion or at the hearing on the 404(b) Motion did Rodella contend or suggest that he was not going to contest willfulness; the Court and the United States thus had to assume it would be contested or might be contested.  It is unfair for Rodella to suggest, in hindsight, after trial, that it was not an issue; it sure looked like a hot issue, and the Court had to deal with it.  He never offered to stipulate to willfulness, or not contest the element, if the three other incidents were not introduced.  Even at trial, while Rodella may not have directly attacked the willfulness element by conceding that the Tafoya incident occurred as the United States asserted it did but arguing that he did not act willfully, the willfulness element was still in dispute.  Rodella did not concede that he willfully violated Tafoya's constitutional rights.  To do so would have led to an interesting defense -- conceding that he willfully violated Tafoya's constitutional rights while, at the same, time arguing that he did not violate Tafoya's constitutional rights.  Instead, Rodella made a strategic decision to attack the United States' factual version of events to argue that he did not violate Tafoya's constitutional rights at all.  By attacking the United States' factual

version, Rodella also attacked the willfulness element, because Rodella could not have willfully committed an act that he did not do. Willfulness was, accordingly, disputed at trial.[9]

Additionally, even though the United States did not, and probably could not, present direct evidence showing Rodella's willfulness -- such as a confession stating that he acted willfully -- the prior incidents were circumstantial evidence that tends to show that Rodella acted willfully. See United States v. Johnstone, 107 F.3d at 208 ("Finally, Screws held that willfulness can be shown by circumstantial evidence."). That Rodella's motive and intent was to express his road rage, punish disrespect, and force motorists to submit to his authority is circumstantial evidence tending to show that he acted willfully. Similarly, if Rodella had a plan to act in a threatening manner toward motorists, provoking them to act in a disrespectful manner, and then force them to submit to his authority, this plan tends to show that he acted willfully. Finally, if Rodella did not mistakenly or accidently believe that his identity as a law enforcement officer was not apparent, that lack of mistake or accident tends to show that he acted willfully. Each of

_____

[9]Rodella relies heavily on cases from the Seventh Circuit. The Seventh Circuit, however, appears treat 404(b) evidence with more hostility than the Tenth Circuit. The Tenth Circuit appears more likely to find that the evidence was admitted for a permissible purpose or, if the evidence was erroneously admitted, that it was harmless error. Even in the Seventh Circuit, the other-act evidence in this case was likely admissible. The Seventh Circuit has held that, if intent is not disputed, then other-act evidence is not admissible to show intent. See United States v. Gomez, 763 F.3d 845, 858 (7th Cir. 2014)(en banc). The Seventh Circuit, however, draws a distinction between general and specific intent crimes. "In cases involving general-intent crimes . . . other-act evidence is not admissible to show intent unless the defendant puts intent at issue beyond a general denial of guilt." United States v. Gomez, 763 F.3d at 858 (emphasis in original)(internal quotation marks omitted). "In contrast, [the Seventh Circuit] ha[s] repeatedly rejected a similar rule for specific-intent crimes because in this class of cases intent is automatically at issue." United States v. Gomez, 763 F.3d at 858 (internal quotation marks omitted). Rodella was convicted of a specific intent offense. See United States v. Reese, 2 F.3d at 884 (noting that § 242 requires a "specific intent" to violate another's constitutional rights). Consequently, even in the Seventh Circuit, Rodella's argument that intent was not disputed would fail.

the United States' proffered reasons link circumstantial evidence to the willfulness element that was disputed at trial.

Moreover, before trial -- when the Court wrote the 404(b) MOO -- it could not have known what issues would be central to the case. Rodella did not disclose to the Court his trial strategies. Rodella could just as easily not disputed the factual allegations and attacked the willfulness element as he could have attacked the factual allegations. Before trial, the Court did not know which strategy Rodella would pursue. Rodella asserts that he did not argue that he mistakenly believed that his identity was not apparent. See Motion at 8. However, if he had pursued this defense to negate willfulness, the prior incidents could have rebutted it, and, before trial, the Court could not have known that Rodella would not pursue this defense. In the same way, the United States could not have known what defenses Rodella would pursue. Before trial, Rodella did not concede that he would not argue that he did not mistakenly believe that his status as a law enforcement officer was not apparent. The United States was left to prepare for -- and the Court anticipate -- whatever defense Rodella may have presented, including attacking the willfulness element by arguing mistake or accident.

Second, there is evidence to support the United States' proffered purposes. Rodella argues that there is no evidence of a plan. See Motion at 7-8. "Plan evidence is offered to show that the crime for which the defendant is accused is actually part of a pre-arranged plan or scheme." United States v. Smalls, 752 F.3d at 1239 n.5. Evidence of a plan can include similar crimes, committed in close temporal proximity to show that the later crime was part of a larger scheme. For instance, in United States v. LaFlora, 146 F. App'x 973 (10th Cir. 2005) (unpublished), the Tenth Circuit affirmed the introduction of similar previous bank robberies to show that the charged bank robbery was part of a common plan. See 146 F. App'x at 975-76.

Similarly, in <u>United States v. Shaw</u>, 562 F. App'x 593 (10th Cir. 2014)(unpublished), the Tenth Circuit affirmed the district court's admission of evidence of a prior assault that was similar to the charged assault. <u>See</u> 562 F. App'x at 598. Here, in each of the prior incidents and the charged incident, Rodella expressed road rage or drove in such a manner that would have provoked another driver -- either tailgating or turning in front of a car and then driving slowly on the highway. Each time, another driver showed some sign of disrespect and Rodella pulled them over -- or attempted to -- and forced the driver to submit to his authority as sheriff. Accordingly, there is evidence that Rodella had a plan to drive in a threatening manner and then force a person to submit to his authority once the person expressed some sign of disrespect.

Third, the United States' proffered purposes do not require an impermissible propensity inference. It should be noted that Rodella did not once argue before trial that the prior-act evidence would impermissibly show propensity or required an impermissible propensity inference. In his response to the 404 Motion, Rodella never once uses the word propensity, but instead focused almost exclusively on the relevance of the evidence. <u>See</u> Defendant Thomas R. Rodella's Response in Opposition to the United States' Motion in Limine to Introduce Evidence Pursuant to Federal Rule of Evidence 404(b) [Doc. 46], filed September 12, 2014 (Doc. 74)("404(b) Response"). <u>See also</u> Defendant's Response in Opposition to Government's Notice of Intention to Introduce Evidence Pursuant to Federal Rule of Evidence 404(b), filed September 9, 2014 (Doc. 51)("404(b) Notice Opposition"). Again, at the hearing on the 404(b) Motion, Rodella never once used the word propensity or argued that the evidence required an impermissible propensity inference. <u>See</u> Transcript of Hearing (taken Sept. 15, 2014), filed January 20, 2015 (Doc. 169)("404(b) Motion Tr."). In the 404(b) MOO the Court noted that

Rodella focused on rule 403, and not rule 404(b), to argue that the Court should not admit the evidence.

> In his briefs, Rodella does not argue that these would be improper purposes to prove willfulness, but instead argues that these purported purposes and that evidence of the prior incidents are not relevant and are highly prejudicial. Even at the hearing, while refusing to concede that these purposes are legitimate in the case, Rodella nonetheless focused on the 403 prong.

404(b) MOO at 29. Rodella's propensity-inference argument is, thus, a new one that he did not raise before trial. As such, Rodella may have waived this argument, and the Tenth Circuit should review the argument under a plain-error standard. See United States v. Culver, 598 F.3d 740, 749 n.5 (11th Cir. 2010)("A party not raising an argument below waives his right to raise it on appeal absent plain error." (citation omitted)(internal quotation marks omitted)). In any case, the prior acts are relevant without requiring the jury to make a propensity-based inference.

Rodella is correct in stating that, if the only purpose of the evidence was to show that, because he engaged in road rage before the charged incident, he must have done so again, the evidence would be inadmissible. See United States v. Commanche, 577 F.3d at 1267 ("We hold that evidence is admissible under Rule 404(b) only if it is relevant for a permissible purpose and that relevance does not depend on a defendant likely acting in conformity with an alleged character trait."). Here, the proper purposes, however, did not require an impermissible propensity link to be relevant. For lack of accident or mistake, if Rodella mistakenly believed that Tafoya should have recognized that he was a law enforcement officer, then he likely did not act willfully. He could not have acted willfully if he truly believed that he was acting lawfully. The other incidents, however, show that, when Rodella is not in uniform, people do not automatically assume that he is a law enforcement officer and that Rodella is aware of this fact.

The other evidence is thus relevant, because it negates the argument that Rodella did not act willfully as a result of a mistake.  This relevance requires no propensity inference.

For the plan, the prior incidents, and the charged incident, show that Rodella had a plan to provoke other motorists and then force them to submit to his authority.  This plan is relevant, because it shows why Rodella assaulted Tafoya.  That is, the reason for his conduct was to follow his plan, and, if his purpose in assaulting Tafoya was to carry out his plan, he was not acting with a lawful intent, which goes to willfulness.  The plan is, thus, relevant without requiring any propensity inference.

If the intent/motive purpose was merely that, because Rodella previously required other motorists to submit to his authority, he must have done it again, then the purpose would require an impermissible propensity inference.  Here, however, Rodella's motive and intent was to further his plan of provoking other drivers, and then forcing them to submit to his authority.  In the script that the Court provided in the 404(b) MOO, the motive/intent purposes were closely related to the plan purpose.  The script reads:

(i)     Rodella's motive and intent for pursuing Tafoya was to express his road rage, punish disrespect, and force Tafoya to submit to his authority and not to enforce any traffic law.

(ii)    Rodella had a plan to drive in a threatening manner towards other motorists, and if he succeeded in provoking any disrespectful act, force the motorist to submit through a display of his authority.  The traffic encounters are part of a common plan Rodella had to require the citizens of Rio Arriba to submit to his authority.

404(b) MOO at 37.  The intent/motive purpose was closely related to the plan purpose, such that Rodella's motive and intent in assaulting Tafoya was to further his plan of forcing other people to submit to his authority.  This intermixing of permissible purposes is common to 404(b) evidence.

It is not easy to distinguish motive from other mental states provable by evidence of other acts.  For example, the person moved to act by a particular motive may form an explicit plan to accomplish his purpose; and once the act has been completed, knowledge of the motive may lead us to infer that the act was done with the intent of reaching the goal implied by the motive.  Thus evidence that a person acted in accordance with a particular plan may permit us to infer back to the motive that produced the plan and forward to the intent with which a subsequent act was carried out.  It is not surprising, then, to find the same sort of evidence being admitted under each of these three different categories.

Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure, § 5240, at 144-45 (2d ed. 2013).  Even though the United States asserted two different purposes -- intent/motive and plan -- they are interconnected so that they are essentially one in the same.  Because this purpose does not require an impermissible propensity inference, the evidence was properly admitted.  In any case, even if the intent/motive purpose required an impermissible inference, there were two other permissible purposes for which the other-act evidence could be admitted.  Rule 404(b) requires only one permissible purpose and not three.

Fourth, the United States' asserted purposes were not merely a euphemism for propensity.  Rodella argues that the word plan can be replaced with the word propensity without changing the 404(b) MOO's meaning and that the jury understood the word plan to mean propensity.  See Motion at 8.  The Court disagrees.  As explained above, there was sufficient evidence to show a plan to drive aggressively, provoke other drivers, and then force them to submit to Rodella's authority.  Rodella is incorrect in stating that the word plan and propensity are interchangeable.  Plan is defined as "[a]ny detailed scheme, program, or method worked out beforehand for the accomplishment of an object."  United States v. Ballou, No. CR 14-2579 JB, 2014 WL 6065639, at *25 (D.N.M. Oct. 16, 2014)(Browning, J.)(quoting The American Heritage Dictionary of the English Language 1001 (William Morris ed., New College ed. 1976)).  Propensity, on the other hand, "is defined as a 'disposition or inclination to some action, course

of action, habit, etc.'" Thorne v. U.S. Dep't of Def., 916 F. Supp. 1358, 1365 (E.D. Va. 1996)

(Ellis, J.)(quoting The Oxford English Dictionary 637 (2d ed. 1989)). While Rodella may be

able to substitute the word plan with the word propensity without changing the grammatical

structure of the 404(b) MOO -- i.e., change plan to commit road rage to propensity to commit

road rage -- such a substitution changes the entire meaning of the 404(b) MOO and of the

permissible purpose. Additionally, even if the evidence had some propensity effect, a potential

propensity side effect does not make the evidence inadmissible. See United States v. Moran, 503

F.3d at 1145 ("[W]hen other-act evidence is admitted for a proper purpose and is relevant, it may

be admissible even though it has 'the potential impermissible side effect of allowing the jury to

infer criminal propensity.'" (quoting United States v. Cherry, 433 F.3d at 701 n.3)). Rodella's

four proffered reasons for why the Court incorrectly admitted the other-act evidence misconstrue

the Court's holding and the law.

Finally, the Court did not abuse its discretion by refusing to exclude the evidence

pursuant to rule 403. Rodella argues that the prejudicial effect of the evidence substantially

outweighs its probative value. See Motion at 9-12. Rodella is correct in noting that the evidence

had some prejudicial effect, as almost any evidence admitted under rule 404(b) does. Prejudice,

by itself, however, is insufficient for exclusion. The prejudice must substantially outweigh the

evidence's probative value. Rodella argues that the evidence had little probative value; he is

mistaken. The prior incidents were highly probative to Rodella's willfulness, which was an

essential issue in the case. To show that the prior acts had little probative value, Rodella first

argues that the prior acts are dissimilar from the charged incident. The Court disagrees. Each of

the prior acts, and the charged incident, involved Rodella driving in an aggressive manner, or in

a manner that would provoke other drivers, and then asserting his authority when another driver

showed some sign of disrespect.   Second, Rodella argues that the prior acts concerned undisputed matters.   As the Court previously stated, Rodella's willfulness was disputed at trial. Third, Rodella contends that the other-act evidence was unnecessary for the United States to prove its case.   The necessity of the evidence and the strength of the United States' case, however, were unknown before trial, and, before both sides rested at trial, neither the parties nor the Court could have known that the United States did not need the evidence to prove its case. Rodella never offered to stipulate to willfulness.   Rodella's arguments for why the prior acts had little probative value are, thus, unpersuasive.

The prior-acts evidence was relevant to an essential element, which the United States was required to show beyond a reasonable doubt.   Moreover, that element -- willfulness -- is hard to prove.   The United States had a high burden of proving that Rodella intended to violate Tafoya's constitutional rights.   This element is hard to prove with direct evidence, because a defendant will rarely admit that he or she intentionally violated another's constitutional rights.   Instead, the United States must rely almost entirely on circumstantial evidence.   See United States v. Johnstone, 107 F.3d at 208 ("Finally, Screws held that willfulness can be shown by circumstantial evidence.").   When the United States presents evidence that, while circumstantial, relates directly to the willfulness element, the Court is hesitant to say that it has little probative value.   Here, the prior incidents show that Rodella had a plan to harass other drivers by forcing them to submit to his authority after he provoked them.   The Tafoya incident appears to be a part of that plan.   If Rodella pursued and assaulted Tafoya in carrying out this plan, it is highly probative to his willfulness.   Therefore, the other-act evidence had great probative value, and

whatever prejudicial effect it may have created does not substantially outweigh its probative value, especially in light of the Court's limiting instruction.[10]

Whether other judges, Circuits, or law professors might not have admitted the evidence is not the issue.  The issue is whether the three incidents show only propensity, such that their admission was plain error, and this issue is not so close or substantial that the issue will likely result in a new trial.  Similarly, even if the standard is not plain error, the issue on appeal will be whether the three incidents show only propensity such that their admission was an abuse of discretion; again, that issue is not a close or substantial question that will likely result in a new trial.  Finally, whether the Court abused its discretion under rule 403 in admitting evidence of the other incidents is not a close question.  The Court did not.  Accordingly, the Court's admission of the 404(b) evidence is not a substantial question that would likely result in a new trial.

---

[10]The three prior incidents here are much less prejudicial than most 404(b) evidence that the Tenth Circuit has permitted, or required, to be introduced in other cases.  In United States v. Tan, the Tenth Circuit reversed Judge Hansen's exclusion of evidence that the defendant had previously been convicted seven times for drunk driving to prove malice in a second-degree murder case resulting from the defendant driving while intoxicated.  See United States v. Tan, 254 F.3d at 1213-14.  When the Court granted the United States' 404(b) Motion, the Court had this case in the back of its mind.  The Court's thought was that, if seven previous drunk-driving incidents are not too prejudicial, three incidents in which Rodella expressed road rage or acted like a jerk are not too prejudicial.  Indeed, compared to most 404(b) cases, Rodella's conduct was tame.  See, e.g., United States v. Zamora, 222 F.3d at 763 (admitting evidence of another robbery); United States v. Mills, 29 F.3d 545, 549 (10th Cir. 1994)(affirming introduction of evidence that defendant previously possessed a firearm during a felon-in-possession case); United States v. McGuire, 27 F.3d 457, 461 (10th Cir. 1994)(affirming district court's admission of evidence of seven other bank robberies to show a plan to rob banks); United States v. Treff, 924 F.2d 975, 982 (10th Cir. 1991)(affirming the district court's admission of evidence that the defendant killed his wife to show his intent, motive, and plan in throwing a firebomb).  In the prior three incidents, Rodella did not commit a crime for which he was convicted, and no one was hurt.  At most, the incidents show that Rodella was an egomaniac, that he acted like a jerk, and that he was rude to other motorists.  This prejudicial effect is fairly minimal compared to the vast majority of 404(b) cases.

2.     **The United States' Closing Argument Is Not a Substantial Question.**

The United States' closing argument is not a close or substantial question that will likely result in a new trial.  The United States began its closing argument by mentioning the Maes incident and Maes' comment about Rodella's ego to contrast Rodella with Tafoya.  See Trial Day 5 Tr. at 1036:19-1037:21 (Neda).  Rodella did not object at this point, and the Court concludes that it was proper argument.  The United States focused its argument on Rodella's ego, which is connected to his plan, intent, and motive to provoke other drivers, and then force them to submit to his authority.  The United States' comments were, thus, related to the willfulness element, which was the only element for which it could use the prior incidents. Later, when the United States discussed the Tafoya incident and how Rodella tailgated him, the United States said: "Boy, is that familiar, considering what else you've heard.  Remember Yvette Maes?"  Trial Day 5 Tr. at 1039:4-10 (Neda).  At this point, Rodella objected and asked for a limiting instruction, which the Court did not itself give.  See Trial Day 5 Tr. at 1039:15-1040:5 (Gorence, Court).  The United States' argument merely pointed out the similarity between the Maes incident and the Tafoya incident -- both involved tailgating.  Noting the similarities between the charged offense and a previous offense does not make the prior offense less admissible or less relevant.  To the contrary, "[t]he more similar the extrinsic act or state of mind is to the act involved in committing the charged offense, the more relevance it acquires toward proving the element of intent."  United States v. Queen, 132 F.3d at 996.  By pointing out the similarities between the charged offense and the previous one, the United States more closely tied the prior incident's relevance to the current case, and more plausibly proved Rodella's plan, intent, and motive.

The United States' statement about the similarity between the Tafoya incident and the Maes incident may have been the United States starting to make an impermissible propensity argument, or it may have been the United States starting to more closely tie the Tafoya incident to a plan to harass other motorists.  The United States may have mentioned the similarities between the incidents to make the impermissible propensity argument that, because Rodella previously tailgated a motorist, he did it again here, or the United States may have discussed the similarities to make the permissible argument that, because the two incidents are so similar, they must be part of a common plan.  One path is problematic while the other acceptable.  The United States did not, however, take either path, because Rodella objected before it could.  The United States' statement was, thus, left hanging in the air.  Wanting to ensure that the United States did not inadvertently follow the wrong path, the Court told the United States to "tie [the prior incident] to the willfulness" and to "clean it up."  Trial Day 5 Tr. at 1039:23-1040:5 (Gorence, Court).  The Court thought and intended that, at this point, the United States would either read the 404(b) MOO's script or would, on its own, tie the prior incident to a plan.  Instead, the United States took an entirely different road by abandoning its argument altogether and, during its initial closing, not returning to the prior incidents, except for one off-hand comment about Gonzales.  While the United States did not take the problematic propensity path, it did not affirmatively tie its previous comment to a plan.  Its comment about the similarity between the Tafoya and Maes incidents was, thus, left hanging in the courtroom; its meaning was ambiguous.  It was not clear whether the United States intended its similarity statement to show propensity or willfulness or, more importantly, whether the statement, left hanging where it was in the Courtroom, actually showed propensity or willfulness.  Because of the statement's ambiguity,

the Court cannot soundly say that it was improper.[11]  Moreover, in light of the Court's jury instructions, which it had already read to the jury, and in light of the Court requiring the United States to read the 404(b) MOO's script at the end of its closing, the Court concludes that the jury should have and likely took the ambiguous statement for its proper purpose, which is to show the similarities between the two incidents to establish a plan.

Before the end of its first closing, the United States made another comment that again referenced the prior incidents.  See Trial Day 5 Tr. at 1051:18-20 (Neda).  In discussing the training that Rodella received, the United States stated: "[The training expert] also taught [Rodella], you're never to pull alongside a car in a pursuit.  Do you remember -- we'll get to Ms. Lisa Gonzales in a moment."  Trial Day 5 Tr. at 1051:18-20 (Neda).  Rodella did not object to this statement.  While it appears that the United States began to make a propensity argument -- that Rodella disregarded his training before, therefore, he did it again -- the United States stopped itself.  The United States started to discuss the Gonzales incident, but then decided

---

[11]Ambiguity, by itself, is insufficient to make a closing statement improper.  Rodella is correct in stating that Circuit Courts overturn convictions because of the United States' improper use of other-act evidence in closing.  Those cases, however, involve far more egregious comments.  See United States v. Simpson, 479 F.3d 492, 503-04 (7th Cir. 2007)(reversing conviction when United States used 404(b) evidence in closing to argue that the defendant had conducted so many drug deals that he cannot even remember conducting the charged drug transaction), abrogated by United States v. Boone, 628 F.3d 927 (7th Cir. 2010); United States v. Moore, 375 F.3d 259, 264 (3d Cir. 2004)(overturning conviction when United States, on the one-year anniversary of the September 11, 2001, terrorist attacks, called the defendant a terrorist because he inflicted terror on a person, other than the victim); United States v. Richards, 719 F.3d at 764-65 (holding that the United States' closing argument was improper when the United States repeatedly called the defendant a drug dealer and made the explicit propensity argument of: "Clearly the defendant's drug dealing is not limited to California.  It happens here too."); United States v. Brown, 327 F.3d 867, 871 (9th Cir. 2003)(reversing district court for improper closing argument when the United States used evidence of other incidents to argue, in closing, "if a man is willing to cheat a little bit over here, wouldn't he be willing to cheat just a little bit over here").  Here, the United States merely commented on the similarities between the Maes incident and the Tafoya incident.  It did not make an explicit propensity argument or an inflammatory comment.  Accordingly, that the comment was ambiguous does not, without more, make it improper.

against it.   Rodella did not object to this statement, and the statement is not so egregious, especially in light of the fact that the United States did not complete it, for the Court to decide sua sponte to instruct the jury.   Accordingly, it is not a close or substantial question whether the Court abused its discretion in not sua sponte instructing the jury.

At the end of its first closing, Rodella objected.

MR. GORENCE:   Two things, Your Honor, first, I would ask for a judicial instruction that Ms. Neda's comments about what happened with Ms. Gonzales was improper and violated your ruling.   She didn't remotely, quote, "clean it up."   She was using that to say that prior -- you have very strict parameters about what it can be used for.   Her statement: Does that sound familiar, to establish if a constitutional violation is exactly the type of character evidence that 404(b) prohibits.   I was expecting that cleanup -- but it never occurred -- to say you can't consider the fact that allegedly the Sheriff pulled up next to him.   Of course, that wasn't even a chase.   But she was using that for a complete improper purpose.   And it wasn't cleaned up.   And I'm asking the Court to do that.

Next -- and I know she has a rebuttal -- she hasn't remotely stated the three things in her closing which she has to; particularly, I would say that one is close, the first one.   The second one about this was a part of a common plan Rodella had to require the citizens of Rio Arriba to submit to his authority.   And she didn't remotely say anything about mistake or accidentally forget that the identity was not apparent to all motorists.

The problem is I haven't heard -- and I'd like to be able to respond -- because, of course, that's my one opportunity in closing, and it seems like it's an apparent disregard for the Court's order to save this for rebuttal, when I can't even rebut or comment on what she said, it's fundamentally unfair.

So at this point I think you can cure the first through an instruction.   There was an improper statement about what happened to Ms. Gonzales and Maes.   She actually said that started later on with Ms. Maes, as well as Mr. Olson just pointed out.

At this point, I'm moving for a mistrial based on the improper use of 404(b), and the disregard Ms. Neda had for the Court's order that now can't be fixed.   Because even to say it in rebuttal doesn't allow me the chance to comment on it.

Trial Day 5 Tr. at 1062:2-1063:17 (Gorence).

The Court agreed that Rodella should have a chance to respond to the 404(b) evidence, so the Court instructed the United States to tell the jury now the purposes for which it could use the evidence.  See Trial Day 5 Tr. at 1063:18-1065:16 (Neda, Court).  Because the United States had not violated the Court's order[12] or misused the 404(b) evidence, the Court did not declare a mistrial.  As noted above, the United States' comments concerning Maes and Gonzales were not improper.  The United States' statements concerning Maes can be tied to willfulness by showing Rodella's desire to have people submit to his authority -- i.e. to satisfy his ego -- and the United States did not finish its thought on Gonzales to make the comment improper.  The only thing the United States did not do was tie the statements directly to willfulness by telling the jury for what purposes it could use the prior incidents.  The Court, thus, agreed with Rodella that the United States did not recite the script contained in the 404(b) MOO and ordered the United States to do so to remedy the situation.[13]

---

[12]While the United States did not give the 404(b) MOO's script during its initial closing, the 404(b) MOO did not state when the United States was required to recite the script.  It only stated that the United States' recitation had to be during the closing arguments.  Thus, by deciding to wait until rebuttal to recite the script, the United States did not necessarily violate the Court's order.

[13]The 404(b) MOO stated that, "upon Rodella's request, the Court will give the jury an appropriate limiting instruction."  404(b) MOO at 37.  In the Court's experience, limiting instructions based on the introduction of 404(b) evidence are often given either at the time the evidence is introduced, at the end of trial, or both.  The Court is, however, hesitant to give a detailed limiting instruction during a party's closing argument if it can remedy the situation some other way.   The Court was prepared to provide an instruction either before or after Maes, Ledesma, and Gonzales testified, but Rodella did not ask for one.  Additionally, Rodella did not submit a jury instruction containing a 404(b) limiting instruction.  See Stipulated Jury Instructions at 1-23; Rodella Jury Instructions at 1-15.  The Court drafted its own limiting instruction to include in the jury instructions, which Rodella said he wanted the Court to include in the jury instructions.  See Trial Day 4 Tr. at 1003:2-10.  Moreover, while the Court itself did not give a limiting instruction, by ordering the United States to read the 404(b) MOO's script, and by the United States placing Jury Instruction Number 7, which contains the script, on the ELMO for the jury to see, the United States' reading and showing the limiting instruction during the initial closing had the same effect as a limiting instruction.

On rebuttal, the United States discussed the other incidents in depth. Rodella did not, however, object once. The United States mainly recited Maes', Ledesma's, and Gonzales' testimony. The United States' highlighted portions of their testimony that was similar to the Tafoya incident and how they related to Rodella's ego. See Trial Day 5 Tr. 1129:15-19 (Neda)(stating that Rodella tailgated Maes and that his "mindset" was not on preventing danger); id. at 1129:23-1130:14 (stating that Rodella was not dressed in uniform and that Gonzales disrespected Rodella); id. at 1132:5-13 (stating that Rodella approached Gonzales' vehicle with his hand on his gun); id. at 1133:6-11 (stating that Rodella is not concerned about the community and that he is concerned only with satisfying his ego). While the United States did not explicitly refer to a specific plan, motive, or intent, the United States' summary of the prior incidents, and its discussion of Rodella's ego and mindset, related to a plan to provoke people and then cause them to submit to his authority. The most inflammatory statement that the United States made on rebuttal was calling Maes, Ledesma, and Gonzales "victims." Trial Day 5 Tr. at 1128:4 (Neda)("What about the defendant's other victims?"). Inflammatory as this statement might be, it is still in line with a permissible purpose. If Rodella had a plan to provoke other drivers and then subdue them, Maes, Ledesma, and Gonzales were as much victims of this plan as Tafoya. Additionally, while the United States mentioned some emotional portions from their testimony -- including that Gonzales became "choked up" and "upset" when testifying, Trial Day 5 Tr. 1132:19-21 (Neda) -- the United States' rebuttal still focused almost exclusively on the testimony to paint a picture of the prior incidents. That the United States decided to discuss how a witness testified in addition to what she testified is not necessarily improper, especially when the jury already saw the manner in which the witness testified.

Because Rodella did not object to the United States' rebuttal -- either during rebuttal or afterwards -- the Court was left with the option of either giving an instruction sua sponte or letting the argument be.  In light of (i) the Court reading to the jury the jury instructions -- which stated the proper purposes for which it could use the prior incidents -- (ii) the United States telling the jury the proper purposes for which it could use the prior incidents; and (iii) the Court providing the jury with a hardcopy of the jury instructions[14] -- which stated the proper

_____

[14]The Court believes that jury instructions are important to the jury and that they take the instructions seriously.  As the Court has previously stated:

At the beginning of a trial, the Court puts the preliminary instructions on the ELMO so that the jury can read along as the Court reads them aloud.  The Court starts discussing the final instructions in the preliminary instructions.  See Tenth Circuit Pattern Jury Instructions Criminal § 1.01, at 4 (2011)("The final part of the trial occurs when I instruct you on the rules of law which you are to use in reaching your verdict").  At the end of the trial, the Court again puts the jury instructions on the ELMO so that the jury can read the instructions as the Court is reading them aloud.  The Court gives a complete set of its final instructions to each juror for use during deliberation.  See Tom M. Dees, III, Juries: On the Verge of Extinction? A Discussion of Jury Reform, 54 SMU L. Rev. 1755, 1784-84 (2001)(noting that jurors deliberate faster, have fewer legal questions during deliberations, and remain focused during deliberations when provided their own copies of the jury instructions).  The Court sends questionnaires to the jurors after every jury trial.  The Court talks to the jurors in chambers after all jury trials.  The Court specifically asks the jurors how helpful the jury instructions were.  They almost always say that the jury instructions were very helpful to them, that it walked them to their decision, that they thought the case was difficult, and they did not know how they would make their decision, but the jury instructions just led them to their decision and the result.  In the questionnaires from this trial, each juror who answered the question stated that he or she had "No Difficulty" understating the Court's instructions.  One juror commented that the "Instructions were great, they kept us focused."

The juries take them seriously, because, in the midst of the adversarial process, an authoritative figure is trying to give them the neutral law to apply.  Trial lawyers know this importance, and many display them up on the ELMO during their closings.  Highly disciplined trial attorneys often present jury instructions on the elements of a case during the first weeks the case are in their office, so that they know exactly what elements they must prove or against what

- 77 -

purposes -- the Court concluded that an additional instruction was unnecessary, especially if Rodella did not ask for one.[15]  After the United States' rebuttal, the Court looked at Mr. Gorence, Rodella's counsel, and he shrugged his shoulders.  The Court was prepared to give Jury Instruction Number 7 again if Rodella wanted it, but he did not ask for it.  The Court was very reluctant to give the instruction sua sponte.  For all the Court knew, Rodella decided that he did not want the three incidents highlighted; he did not want the last thing the jury heard before deliberations to be the Court telling them about the three incidents.  That was a strategic decision by an expert counsel for whom the Court has a lot of respect.  It was reluctant to override his judgment by sua sponte giving that instruction.  Because Rodella did not object to the United States' rebuttal, and because the rebuttal related to the permissible purposes for which the United States could use the evidence, the Court concludes that Rodella's appeal is not exceptionally strong and his appeal will not likely result in a new trial.  Everything up to the United States'

---

elements they have to defend, and these elements guide their discovery and pretrial briefing.

. . . .

Accordingly, the Court has a high[] regard of jurors and their ability to understand jury instructions.  They think they are important.  They are intelligent people and take their important role seriously.

Ysasi v. Brown, No. CIV 13-0183 JB, 2015 WL 403930, at *26 n.8 (D.N.M. Jan. 7, 2015)(Browning, J.)

[15]The Court certainly did not and does not read Rodella's failure to object as implicit approval of the United States' rebuttal.  Rodella may have wanted to object and request an instruction, but feared drawing more attention to unfavorable evidence.  It appears that he made the strategic decision to not object.  As the United States pointed out, on appeal, the rebuttal will likely be examined under a plain-error standard rather than an abuse-of-discretion one.  Rodella took a gamble and decided to possibly strengthen his chances of winning at trial by waiving his right to an abuse-of-discretion review.  While the Court is sympathetic with the hard choice Rodella had to make, it is the choice that attorneys and defendants are faced with every day in the courtroom.  Rodella made his choice, and he is now stuck with its consequences.

rebuttal is governed by the abuse-of-discretion standard, and there was no error by the Court or misuse by the United States.  In rebuttal, there was no misconduct by the United States, but even if it were, the plain-error standard should govern that issue.

As the United States' points out, Rodella's failure to object during rebuttal likely waived his objection, and the Tenth Circuit should likely review its rebuttal under a plain error standard. Rodella maintains that his earlier objection sufficiently preserved the error.  See Reply at 5.  The court does not think that such a finding would be fair to the Court, in part because Rodella does not indicate which objection protected the error.  If it was the objection he made early into the United States' rebuttal, there was no error, because the United States did not even finish its sentence.  If it was the objection that he made after the initial closing and which complained about the United States not reading the script, the Court dealt with that objection and required strict compliance.  Nothing about those two objections helped the Court do its job after rebuttal; Rodella made a strategic decision  by not asking the Court for anything at that part, and now wants to claim an abuse of discretion.  In any case, it is not a close or substantial question whether the Court abused its discretion in failing to sua sponte give a limiting instruction after the United States' rebuttal.

The Court does not believe that anything the United States did in rebuttal resulted in plain error, or that the Court in not giving another instruction or in not declaring a mistrial was plain error.   Moreover, neither of these questions are close or substantial which will likely result in a new trial.  Consequently, because Rodella fails to present a substantial question, the Court will deny the Motion.

**B.      EVEN IF THE QUESTIONS ARE CLOSE, THEY ARE HARMLESS ERROR.**

Even if the questions are close, they are harmless error.  Section 3143 requires the substantial question to be one that is "likely to result in . . . an order for a new trial."  18 U.S.C. § 3143.  The Court's admission of the 404(b) evidence and the United States' closing argument would not likely result in a new trial.  Improperly admitted 404(b) evidence and improper closing argument are subject to a harmless error review.  See United States v. Rich, 348 F. App'x 352, 354 (10th Cir. 2009)(unpublished)("Erroneous admission of Rule 404(b) evidence is subject to harmless error review."  (citing United States v. Wilson, 107 F.3d 774, 785 (10th Cir. 1997), abrogated on other grounds by United States v. King, 632 F.3d 646 (10th Cir. 2011))); United States v. Gonzales, 58 F.3d 506, 512 (10th Cir. 1995)(applying harmless error standard to prosecutor's erroneous statement during closing argument).

**1.      Admission of the 404(b) Evidence, If It Was Error at All, Was Harmless Error.**

Admission of the 404(b) evidence, if it was error at all, was harmless error.  "An erroneous admission of evidence is harmless unless it had a 'substantial influence' on the outcome or leaves one in 'grave doubt' as to whether it had such effect."  United States v. Bornfield, 145 F.3d 1123, 1131 (10th Cir. 1998)(quoting United States v. Cass, 127 F.3d 1218, 1224 (10th Cir. 1997)).  "Under that standard, [the Court should] review the entire record, focusing particularly on the erroneously admitted [evidence]."  United States v. Starr, 276 F. App'x 761, 765 (10th Cir. 2008)(unpublished)(citing United States v. Tome, 61 F.3d 1446, 1455 (10th Cir.1995)).  The Tenth Circuit regularly finds that the improper admission of 404(b) evidence is harmless error when there is substantial evidence of guilt.  See, e.g., United States v. Romero-Rojo, 67 F. App'x at 572 ("Here, the evidence of guilt was overwhelming."); United

States v. Vaughan, 450 F. App'x 757, 762 (10th Cir. 2011)(unpublished)("Nonetheless, in light of the overwhelming evidence tending to establish Vaughan's guilt, the evidentiary error was harmless.").

Here, excluding the other-act evidence, there was sufficient evidence showing Rodella's guilt.  Rodella himself argues that the other-act evidence was unnecessary to prove the United States' case, because "if Rodella had behaved as Tafoya claimed, the jury could readily have inferred that he acted willfully."  Motion at 12.  Based on the jury's verdict, it appears that the jury believed Tafoya's version of events.  The Court has previously stated that Rodella's key witness -- Rodella, Jr. -- who testified to Rodella's version of events, was impeached on a number of grounds.  See Memorandum Opinion and Order at 63, filed February 2, 2015 (Doc. 182).  The United States' key witness, on the other hand -- Tafoya -- testified with relative consistency and, despite a lengthy cross examination, came out relatively unscathed.  The United States produced a number of other witnesses who testified fairly consistently with Tafoya's testimony and whose testimony contradicted Rodella, Jr.'s on a number of points.  The single witness who testified to Rodella's version of events was severely impeached on a number of grounds by the time he finished testifying, while the United States' key witness testified in a consistent manner and had his testimony bolstered by other witnesses.

Rodella argues that the United States placed Maes, Ledesma, and Gonzales at the end of their case-in-chief to take advantage of the recency effect and to compound the impact of their testimony.  While this may be true, the Court believes that a more reasonable explanation for the United States' witness order was to tell a logical story.  The United States' first twelve witnesses testified about the charged incident.  The United States' second-to-last witness, Dominguez, testified about the charged incident as well; however, she was a last-minute witness whom the

United States did not initially intend to call.  See Trial Day 3 Tr. at 585:7-14 (Peña)("[The United States] didn't anticipate that [Dominguez] would be a witness to this.  But given how the evidence has come in, and specifically the cross-examinations, we now intend to call her.").  The United States, thus, initially planned to have its first witnesses testify about the Tafoya incident and its last witnesses testify about the prior incidents.  It would have been odd, and possibly confusing to the jury, for the United States to break up the testimony about the Tafoya incident with testimony about the previous incidents.  Instead, the United States intended to tell the full story of the Tafoya incident all at once before turning to tell the stories of the prior incidents. This strategy appears to be one of logical storytelling and not one that is meant to highlight the prior incidents.

In light of the entire record from trial, the Court cannot say that it has grave doubts that the 404(b) evidence may have had a substantial impact on the trial.  The evidence produced at trial overwhelmingly supports a conviction and the other-act evidence likely had little impact on the jury's determination.   Accordingly, even if the Court improperly admitted the other-act evidence, it was harmless error that would not result in a new trial on appeal.

## 2. The United States' Closing Argument, If It Was Problematic in Any Way, and the Court's Responses and Nonresponses Were Harmless Error.

The United States' closing argument, it was problematic in any way, and the Court's responses and nonresponses were harmless error.  The standard for reviewing improper argument varies depending on whether the defendant objected.  If the defendant properly objected, the Court must "first determine whether the prosecutor's conduct was in fact improper, and second, whether the error was harmless beyond a reasonable doubt."  United States v. Rogers, 556 F.3d 1130, 1140-41 (10th Cir. 2009).  "But when a defendant fails to object to an allegedly improper

statement during trial, [the Court should] review only for plain error and it is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." United States v. Fleming, 667 F.3d 1098, 1103 (10th Cir. 2011)(citation omitted)(internal quotation marks omitted).  Rodella objected only to the United States' initial closing argument and not to its rebuttal.  The Court will thus determine if the initial argument was likely harmless beyond a reasonable doubt and will determine if the rebuttal, if it was problematic in any way, and the Court's responses and nonresponses were plain error.

The Court believes that the Tenth Circuit will find that the United States' initial closing and the Court's responses and nonresponses, if they were problematic in any way, were harmless beyond a reasonable doubt.  "In evaluating the harm or prejudice of an allegedly improper statement, [the Court] considers the extent of the misconduct; whether the . . . [C]ourt took steps to mitigate the impact of the misconduct; and the role of the misconduct within the case as a whole."  United States v. Fleming, 667 F.3d 1098, 1106 (10th Cir. 2011)(alterations omitted)(internal quotation marks omitted)(citation omitted).  Some factors the Tenth Circuit considers in determining harmless error includes whether the court instructed the jury in a way that mitigated the harm and whether the record includes ample evidence from which the jury could conclude that the defendant committed the crime.  See United States v. Aldape, 28 F.3d 113, at *1 (10th Cir. 1994)(table opinion)(unpublished).  The Tenth Circuit also considers the portion of the closing argument that was improper.  See United States v. Begay, 550 F. App'x 604, 612 (10th Cir. 2013)(unpublished).  First, the Court properly instructed the jury on the permissible purposes for which it could use the other-act evidence.  See Jury Instructions at 9. The Court also instructed the jury that it should decide Rodella's guilt solely on the crime charged and not on any other uncharged crime.  See Jury Instructions at 27 ("You are here to

decide whether the government has proved beyond a reasonable doubt that Mr. Rodella is guilty of the crimes charged. Mr. Rodella is not on trial for any act, conduct, or crime not charged in the indictment."). Second, as shown above, outside the other-act evidence, there was ample evidence showing Rodella's guilt. The jury was essentially required to determine whether it believed the United States' version of events or Rodella's. Rodella's key witness who testified to his version of events was impeached on multiple grounds while the United States' was not. Third, in the United States' initial closing argument, it spent relatively little time on the other-act evidence. The United States briefly mentioned the Maes incident at the beginning of its closing, and then made two offhand comments about Maes and Gonzales, both of which did not discuss the two incidents in any depth. The vast majority of the United States' initial closing was spent on the charged incident. See United States v. Aldape, 28 F.3d 113, at *1 ("The prosecutor's statement arose during a few brief moments in a trial that lasted four days."). The United States' comments during the initial closing were, thus, harmless in light of the entire record from trial.

Additionally, the United States' rebuttal was not plain error. Rodella did not object once during or after the rebuttal. The Tenth Circuit will, therefore, likely apply the plain error standard. See United States v. Fleming, 667 F.3d at 1103. "Plain error requires Defendant to demonstrate that there is (1) error, (2) that is plain, which (3) affects the defendant's substantial rights, and which (4) seriously affects the fairness, integrity or public reputation of judicial proceedings." United States v. Rogers, 556 F.3d at 1141 (citation omitted)(internal quotations omitted). As noted above, there was ample evidence showing Rodella's guilt. The other-act evidence did not affect Rodella's substantial rights or seriously affect the trial's fairness, because the jury would have convicted even without the 404(b) evidence. Accordingly, the United States' closing argument and rebuttal, if problematic, was harmless. The Court predicts that the

Tenth Circuit will find that the Court's nonresponse was also likely harmless error.  Because the other-act evidence and the United States' closing argument were, at most, harmless and the Court's response, if even error at all, was also harmless, Rodella has failed to show that his purportedly substantial questions would likely result in a new trial.

## II.   RODELLA HAS NOT SHOWN EXCEPTIONAL CIRCUMSTANCES.

Rodella has not shown exceptional circumstances that would warrant his release pending appeal.  Because Rodella has been convicted of a crime of violence, he must make "a clear showing of exceptional reasons why his detention would not be appropriate."  United States v. Kinslow, 105 F.3d at 557.  Rodella argues that there are five reasons that, taken individually or collectively, constitute exceptional reasons.  These reasons include: (i) the strength of his appeal; (ii) his poor health; (iii) the nature of the violent act; (iv) his status as a law enforcement officer; and (v) his family circumstances.  See Motion at 18-21.  These reasons, taken either individually or collectively, are not sufficiently exceptional to warrant release pending appeal.

### A.   THE STRENGTH OF RODELLA'S APPEAL IS NOT EXCEPTIONALLY STRONG.

Rodella contends that the strength of his appeal is an exceptional circumstance that warrants release pending appeal and argues that the strength of his appeal should color his other exceptional reasons, because, if he is likely to win on appeal, any period of incarceration is unreasonable.  The Court disagrees.  Rodella's appeal is not exceptionally strong.  While the Court agrees that any undeserved incarceration is unreasonable, the Court does not believe that Rodella's appeal is so strong that the Tenth Circuit will likely reverse his conviction and hold that his incarceration is undeserved.

Rodella argues that he has raised two substantial questions on appeal that illustrate the strength of his appeal.  First, Rodella contends that the Court erred in permitting the United

States to introduce at trial the 404(b) evidence and, second, that the United States' closing argument was improper.  Both of these issues are not so exceptionally strong for the Court to believe that Rodella is undeservedly incarcerated.

> **1.      The Court Properly Admitted the 404(b) Evidence.**

As the Court has already noted, the other-act evidence was admitted for proper purposes. See supra Section I.A.1.  The purposes of motive, intent, plan, and absence of mistake or accident all relate to Rodella's willfulness, which was a disputed issue at trial.  Additionally, the prior incidents were each sufficiently linked to a proper purpose without requiring the jury to make an improper propensity inference.  See supra Section I.A.1.  The prior incidents were, therefore, admitted for a proper purpose, and Court did not commit plain error or abuse its discretion in admitting the evidence under rule 404(b).  Rodella's propensity argument is, thus, not exceptionally strong.

Rodella also argues that the prejudicial effect of the 404(b) evidence substantially outweighs its probative value.  Rodella argues that the only similarity between the prior incidents and the charged one is that they show that Rodella is a jerk.  See Motion at 10-11.  Rodella asserts that the other incidents did not address a disputed issue at trial and that there was ample other evidence, outside of the prior incidents, with which the United States could have made its case.  See Motion at 11-12.  The Court disagrees.

First, as noted above, each prior incident and the charged incident involved Rodella driving in an aggressive manner or in a manner calculated to provoke other drivers, and involved Rodella asserting his authority to make the other driver submit to it.  Second, because Rodella did not concede that he willfully violated Tafoya's constitutional rights, the willfulness element was disputed at trial.  Third, while there was sufficient evidence admitted at trial for the United

States to prove its case beyond a reasonable doubt and to the jury's satisfaction, the United States -- and the Court -- could not have known that before trial. Before trial, it was not clear whether the United States would sufficiently impeach Rodella, Jr., whether Tafoya would testify in a consistent, believable manner, and whether the rest of the United States' case would fall into place so that the prior-act evidence was unnecessary. Before trial -- when the Court had to rule on the admissibility of the evidence -- it was not clear that the other-act evidence would be unnecessary and have less probative value. Accordingly, when the Court decided the 404(b) MOO, it was unclear how the trial would pan out. Moreover, while Rodella objected to some of Maes', Ledesma's, and Gonzales' testimony at trial, he did not object to the key parts that described the prior incidents, and he did not argue that, after the evidence had panned out in the manner that it did, their testimony was no longer necessary to show willfulness. The Court continues to believe that its ruling in the 404(b) Motion was correct and that it was not a close question.

It is not a close question whether the Court abused its discretion in admitting the other-act evidence, and, if the question is not close, Rodella's appeal is not exceptionally strong. Accordingly, Rodella is not likely to win on appeal, and the Court concludes that his appeal's strength is not exceptional.

### 2.      The United States' Closing Argument Will Not Likely Result in a Reversal.

The United States' closing argument will not likely result in a reversal. Rodella argues that, even if the Court properly admitted the 404(b) evidence, the United States misused it in closing. The United States' use of the prior incidents in closing, however, was not so improper to require reversal, especially in light of Rodella's lack of objections.

As the Court noted earlier, each of the United States' statements concerning the prior incidents were tied to the willfulness element, or were used to show the similarities between the prior incidents and the charged incident.  See supra Section I.A.2.  After the United States' initial closing, Rodella objected that the United States' use of the evidence was improper and that the United States did not follow the 404(b) MOO.  See Trial Day 5 Tr. at 1062:2-1063:17 (Gorence).  While Rodella stated that the use was "improper," he did not say what was improper about it.  Trial Day 5 Tr. at 1062:2-1063:17 (Gorence).  Because the United States' statements during its initial closing were related to willfulness, the Court did not grant Rodella a mistrial, but instead, ordered the United States to follow the 404(b) MOO and tell the jury the proper purposes for which it could use the 404(b) evidence.  See Trial Day 5 Tr. at 1063:18-1065:2 (Neda, Court).  Moreover, the Court did not give a limiting instruction, because it already read the jury instructions to the jury, which contained a limiting instruction, see Jury Instructions at 9, and because the United States' recitation of the script from the 404(b) MOO played the same role as a limiting instruction.  The Court does not believe that it abused its discretion in ordering the United States to comply with the 404(b) MOO instead of giving a limiting instruction or declaring a mistrial.  The United States' comments in its initial closing were not improper.  The only improper part of the initial closing was that the United States did not comply with the 404(b) MOO, which the Court remedied by ordering the United States to read to the jury the proper purposes for the other-act evidence.

Similarly, the Court's refusal to sua sponte give a limiting instruction or to declare a mistrial after the United States' rebuttal was not error.  The United States' rebuttal consisted of recounting Maes', Ledesma's, and Gonzales' testimony and highlighting their similarities to the charged incident -- which showed relevance -- and highlighting how they related to Rodella's

ego -- which showed willfulness.  See supra Section I.A.2.  The United States' rebuttal consisted of permissible argument by merely recounting the prior incidents and saying how they related to the current case.  Moreover, the Court is hesitant to give a limiting instruction when the defendant does not request one.  Rodella may not have wanted to highlight the bad facts any more than necessary.  See United States v. Gomez, 763 F.3d at 860 ("[S]ua sponte limiting instructions in the middle of trial, when the evidence is admitted, may preempt a defense preference to let the evidence come in without the added emphasis of a limiting instruction."). Giving a limiting instruction sua sponte may have been contrary to Rodella's wishes and trial strategy.  While the Court would have given a limiting instruction if requested, Rodella did not request one.  The Court does not believe that it committed plain error in not sua sponte giving a limiting instruction at that point.  Moreover, the Court cannot say that it abused its discretion by failing to give such an instruction sua sponte.

Accordingly, because the Court did not abuse its discretion or commit plain error through its responses and nonresponses during the United States' closing arguments, Rodella will not likely win on appeal on that issue.  Rodella's appeal is thus not exceptionally strong to warrant his release.

### B.    RODELLA'S HEALTH IS NOT AN EXCEPTIONAL REASON.

Rodella's health is not an exceptional reason.  In his Motion, Rodella states that his health has worsened since incarceration and that Torrance County Detention is not capable of treating his health condition.  See Motion at 19.  The United States submitted an electronic mail transmission from Rodella's treating nurse practitioner, stating what treatments Rodella has received and stating that his health has improved since incarceration.  See Peterson Email at 1-2. Rodella responds by stating that the Peterson Email conflicts with the PSR, which states that

Rodella is a hemochromatosis carrier, which causes the body to absorb too much iron and can cause serious conditions, including cancer, heart arrhythmias, and cirrhosis. See Reply at 7-8. At the March 10, 2015, hearing, in response to the Court's question whether Rodella's health had deteriorated since incarceration, Rodella discussed the psychological effects of solitary confinement. See Tr. at 41:17-43:15 (Cline, Court).

Rodella has not presented any evidence that his health has declined or that his health is an issue. Rodella has the burden of proof to clearly show exceptional circumstances. See 18 U.S.C. § 3145(c) (stating that it must be "clearly shown that there are exceptional reasons why such person's detention would not be appropriate"); United States v. Bonczek, No. CR 08-0361 PAC, 2009 WL 2924220, at *2 (S.D.N.Y. Sept. 8, 2009)(Crotty, J.)("Defendant has the burden of proof and it is an exacting one, requiring the defendant to clearly show that § 3145(c) has been satisfied." (alterations omitted)(citation omitted)(internal quotation marks omitted)). Rodella makes the blanket assertion that his health has deteriorated, while the United States has presented an electronic mail transmission from Rodella's nurse practitioner undermining this assertion. At the March 10, 2015, hearing, when confronted about his health and whether it has deteriorated, Rodella relied on the PSR. While the PSR notes that hemochromatosis can cause serious conditions, such as cancer, heart arrhythmias, and cirrhosis, it did not state that Rodella is currently suffering from any of those conditions. See PSR ¶ 56, at 12. Additionally, between October and December, 2014, Rodella had his hemochromatosis tested twice. See Peterson Email at 1. Contrary to his assertion that he is not getting adequate care to treat his hemochromatosis, it appears that he is not yet suffering from any severe adverse effects and Torrance County Detention is frequently monitoring his condition. Furthermore, as the United States noted, the BOP has designated Rodella for transfer to a BOP facility, where, even Rodella

concedes, he will receive adequate treatment.  See Reply at 8 ("The medical staff at any federal BOP facility can handle Rodella's health issues . . . .").

At the March 10, 2015, hearing, Rodella also argued that solitary confinement has had a psychological impact on him.  While the Court does not doubt that solitary confinement has a psychological impact, this impact is not exceptional.  Incarceration in general has a psychological effect.  See Mika'il DeVeaux, The Trauma of the Incarceration Experience, 48 Harv. C.R.-C.L. L. Rev. 257, 258-59 (2013)(noting that some studies have concluded that incarceration has a substantial psychological effect).  Moreover, studies have shown that between 25,000 and 80,000 inmates from both state and federal facilities are kept in solitary confinement. See Jean Casella & James Ridgeway, How Many Prisoners Are in Solitary Confinement in the United States?, Solitary Watch (Feb. 1, 2012), http://solitarywatch.com/2012/02/01/how-many-prisoners-are-in-solitary-confinement-in-the-united-states.  The psychological effect of incarceration cannot constitute exceptional circumstances if it is experienced across the general prison population.  Additionally, the Court cannot soundly consider Rodella's situation out of the ordinary, uncommon, or rare if between 25,000 and 80,000 inmates are being kept in solitary confinement.  Accordingly, Rodella's health does not constitute an exceptional reason that warrants release.

### C.    THE NATURE OF RODELLA'S CRIME IS NOT AN EXCEPTIONAL CIRCUMSTANCE.

The nature of Rodella's crime is not an exceptional circumstance.  Rodella argues that, because he is no longer a law enforcement officer, he is unlikely to commit another violent crime.  See Motion at 19-20.  The Court agrees, see Sentencing MOO at 90 (noting that, because Rodella is no longer a law enforcement officer, he will likely not commit a similar crime), but believes that the nature of Rodella's offense is not exceptional.  Several courts have held that the

nature of a defendants' violent act may constitute an exceptional circumstance.  See, e.g., United States v. Garcia, 340 F.3d at 1019.  The Tenth Circuit has not weighed in on whether the nature of the violent act can constitute an exceptional circumstance; however, even if the nature of the violent act could constitute an exceptional reason, the nature of the act must still be exceptional -- i.e. out of the ordinary, rare, or uncommon.

Rodella argues that, because he presents a low risk of future violence, the nature of his act is exceptional.  See Motion at 20.  He contends that, absent exceptional circumstances, Congress mandates the incarceration of violent offenders, "because as a group they present an especially high likelihood of endangering the community."  Reply at 8.  He asserts that some violent acts -- including his -- mitigate Congress' concern, and that, because he presents a low risk of future violence, Congress' concern is not implicated here.  See Reply at 8.  Rodella's low-risk-of-future-violence argument, however, cannot stand in light of § 3143.  To be released pending appeal, § 3143(a)(2)(B) requires a defendant to show by clear-and-convincing evidence that he or she does not "pose a danger to any other person or the community."  18 U.S.C. § 3143(a)(2)(B).  If a low risk of future violence was sufficient to warrant release of a violent offender, then every defendant who is convicted of a crime of violence would be released as long as he or she met § 3143(a)(2)(B)'s requirements, making § 3145(c)'s exceptional-circumstance's requirement meaningless or superfluous.  Contrary to congressional intent, violent offenders would not be treated any different than non-violent offenders.  Applying such a broad exception does not -- as Rodella contends -- further Congress' intent; it undermines congressional intent.

Instead of adopting Rodella's broad exception, the Court believes that a better rule is to release a violent offender only when the violent act itself is exceptional, such that the defendant "may not be the type of violent person for whom Congress intended the mandatory detention

rule." United States v. Garcia, 340 F.3d at 1019.  The Ninth Circuit gives three examples: (i) a violent act that did not involve any specific intent; (ii) a violent act that did not involve a threat or injury; and (iii) a mercy killing.  See United States v. Garcia, 340 F.3d at 1019.  Each of these examples are exceptional and do not involve defendants who would normally be considered violent.  If a defendant commits a violent act, but not with a specific intent, the defendant may not be a violent person and did not intend to commit the violent act.  Similarly, if a person committed a violent act that did not involve a threat or injury, the act may not truly be considered violent, considering no violence was done to another.  Additionally, a person who commits a mercy killing does not do so out of spite or ill will toward the victim, but out of compassion and a desire to help.[16]  At least one district court has noted that a possessor of child pornography's action was exceptional when the defendant's action appeared to be "an aberrational act" that involved "a one-time out-of-character incident, precipitated by large quantities of pain medications [the defendant] was taking for a serious of medical conditions" and when the defendant "stopped viewing such images a substantial time prior to the FBI discovering the images." United States v. Szymanski, No. CR 08-0417, 2009 WL 1212249, at *2-3 (N.D. Ohio Apr. 30, 2009)(Zouhary, J.).  Each of these examples involve a crime that is rare, uncommon, or out of the ordinary when compared with similar violent crimes.

In contrast, Rodella's crime is not rare, uncommon, or out of the ordinary.  Rodella violated Tafoya's constitutional rights by chasing him in an unmarked vehicle, jumping into Tafoya's car, pointing a gun at Tafoya's face, telling Tafoya it is too late as he begged for his life, and arresting Tafoya.  First, 18 U.S.C. § 242 cases for violating a person's constitutional

---

[16]The Court is not saying that mercy killings should be encouraged or that offenders should not be punished, but only that such a killing is exceptional in relation to other violent crimes.

rights are not uncommon.  See, e.g., United States v. Cossette, 593 F. App'x 28 (2d Cir. 2014)(unpublished); United States v. Dautovic, 763 F.3d 927 (8th Cir. 2014); United States v. Gould, 672 F.3d 930 (10th Cir. 2012).  Second, even if Rodella's conduct was uncommon in comparison to most § 242 cases or to most violent crimes, it is not uncommon to the point that Rodella is not "the type of violent person for whom Congress intended the mandatory detention rule."  United States v. Garcia, 340 F.3d at 1019.  Rodella -- a high-ranking police officer -- intentionally committed a violent act against another person and threatened to kill that person as he begged for his life; if the crime was exceptional in any way, it is its outrageousness. Rodella's offense was an intentional, violent one, making him the person for whom Congress intended the mandatory detention rule to apply.  Accordingly, the nature of Rodella's violent crime is not an exceptional reason that warrants release.

### D.    RODELLA'S STATUS AS A FORMER LAW ENFORCEMENT OFFICER IS NOT AN EXCEPTIONAL CIRCUMSTANCE.

Rodella's status as a former law enforcement officer is not an exceptional circumstance. Rodella asserts that, at Torrance County Detention, he has received threats.  See Motion at 20. At the March 10, 2015, hearing, Rodella noted that the individual who had threatened him has been transferred, but that another inmate recently threatened him.  See Tr. at 43:16-24 (Cline). He also argued that he is being kept in solitary confinement for his own safety and that, if he were transferred to a BOP facility, he would no longer have to stay in solitary.  See Tr. at 43:3-44:21 (Cline, Court).  The Court concludes that Rodella's position as a former law enforcement officer is not an exceptional reason.

Rodella cites to a dissenting opinion that the Honorable Stephen R. Reinhardt, United States Circuit Judge for the Ninth Circuit, wrote, and Judge Noonan Joined.[17]  See United States v. Koon, 6 F.3d at 568 (Reinhardt, J., dissenting).   While Judge Reinhardt believed that the risk to the defendants was significantly greater than other prisoners, such that the risk constituted an exceptional circumstance, the defendants in that case received national notoriety to a point that Rodella has not.  There, the defendants' beating of Rodney King sparked five days of riots in Los Angeles that left over fifty people dead, more than two thousand injured, and over one billion dollars in damage.  See CNN Library, Los Angeles Riots Fast Facts, CNN (May 3, 2014, 10:09 a.m.),  http://www.cnn.com/2013/09/18/us/los-angeles-riots-fast-facts.     Rodella's  case  has sparked  the  media's  attention,  including  some  national  media  outlets.   See, e.g., Russell Contreras, Ex-New Mexico Lawman Gets 10 Years in Bizarre Road Rage Case, Yahoo! News (Jan.  21,  2015,  7:41  a.m.),  http://news.yahoo.com/ex-mexico-lawman-gets-10-years-bizarre-road-191236422.html.  Rodella's case has still received less national notoriety, however, than the defendants in United States v. Koon.  Furthermore, Judge Reinhardt's opinion was a dissenting one.  The majority refused to hear the case en banc to reconsider the denial of the defendants' request to be released pending appeal.  See United States v. Koon, 6 F.3d at 561-62.  If the risk to the Rodney King defendants was insufficient for release pending appeal, certainly Rodella's situation is insufficient as well.

Rodella has not presented any evidence showing that his safety is at risk other than a few threats he received from other inmates who, as far as the Court can tell, are physically separated

---

[17]In the Motion, Rodella noted that the Honorable Alex Kozinski, United States Circuit Judge for the Ninth circuit, joined Judge Reinhardt's dissent.  See Motion at 20.  While Judge Kozinski joined part of Judge Reinhardt's dissent, he refused to join the portion of Judge Reinhardt's dissent that concerned exceptional circumstances.  See United States v. Koon, 6 F.3d at 568 (Kozinski, J., dissenting).

from Rodella.   Incarceration is inherently dangerous.   When society contains dangerous individuals into a small enclosed space, that space is rife with risk and danger.   The guards certainly do all they can to minimize those risks, but the risk can never be completely eliminated. Rodella may be more at risk than the average inmate, because of his former profession; however, Torrance County Detention has minimized that risk by placing him in solitary confinement, where he is kept out of harm's reach.   While Rodella has received verbal threats, his sequestration has protected him from physical harm.  The Court cannot say that Rodella's risk is exceptional.   If anything, it appears that, by being sequestered from the general prison population, Rodella is at less risk than the average inmate.  And, while solitary confinement may cause greater psychological harm than normal incarceration, based on the number of inmates in solitary, the Court cannot say that such harm is out of the ordinary, rare, or uncommon.  And everyone conceded that, once he is at a BOP facility, his safety is greatly increased and his reason is not exceptional.   See Tr. at 44:18-20 (Cline)("[I]f Mr. Rodella gets put in a BOP facility, I believe he's not going to be in this sort of solitary confinement.").   Accordingly, Rodella's position as a former law enforcement officer is not an exceptional reason.

### E.       RODELLA'S FAMILY SITUATION IS NOT EXCEPTIONAL.

Rodella's family situation is not exceptional.   Rodella argues that his incarceration will be particularly hard for his children, his mother, and his wife.   See Motion at 21.  In his Reply, Rodella concedes that, "[s]tanding alone, [his] family circumstances would not be grounds or release under § 3145."  Reply at 9.  He argues, however, that "in combination with the other reasons . . . , the strain that his incarceration places on his mother, his wife, and his children makes it unreasonable to incarcerate [him] prior to the appellate court's resolution of his appeal." Reply at 9 (alterations omitted)(citation omitted)(internal quotation marks omitted).  The Court

agrees that his family circumstances are not exceptional, but disagrees with Rodella on the second point. The Court concludes that Rodella's family situation, in combination with his other reasons, is not exceptional.

First, Rodella's family situation is not exceptional in the manner that would warrant release pending appeal. An exceptional case may call for release when the defendant is raising small children by himself or herself, and the children have special needs for which only the defendant can provide. Rodella's is not such a situation. Rodella's children are grown. While it is commendable that he is still involved in their lives, they no longer need him in the same way that a young child needs a parent. Additionally, his mother is not left without care. His wife or siblings can care for her while he is away. Rodella's case is exceptional only in the sense that he has a much more stable family and greater support system than most defendants who stand before the Court. This stability and support, however, do not call for Rodella's release, but instead indicate that they will be able to get along without him.[18]

Second, the combination of all of Rodella's circumstances does not constitute exceptional circumstances. The Court examined each of Rodella's proffered reasons and determined that they are not exceptional. As a whole, they are still not exceptional. At most, they show that Rodella is unique. He will face certain difficulties that are unique to him. Every defendant's situation is different. Every defendant brings his or her own baggage, difficulties, and pain to prison. Rodella is no different. His appeal, health, offense, former profession, and family are unique to him, but they are not exceptional to the point that he should be released pending

---

[18]The Court is not minimizing the hardship and difficulties that Rodella's family will face while he is incarcerated. Instead, the Court is highlighting that Rodella's family is better off than the families of most criminal defendants that the Court sees on a daily basis. The suffering that Rodella's family will face is not exceptional in relation to the vast majority of other families whose loved ones are incarcerated.

appeal.  Section 3145(c) requires a clear showing "that there are exceptional reasons why such person's detention would not be appropriate."  18 U.S.C. § 3145(c).  Rodella has failed to make such a showing.  There are, therefore, not exceptional reasons for his release, and the Court will deny the Motion.

      **IT IS ORDERED** that the Motion for Release Pending Appeal, filed February 6, 2015 (Doc. 195), is denied.

 

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Tara C. Neda
Jeremy Peña
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

       *Attorneys for the Plaintiff*

Robert J. Gorence
Louren M. Oliveros
Gorence & Oliveros PC
Albuquerque, New Mexico

--and--

John Cline
San Francisco, California

       *Attorneys for the Defendant*